[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 433.]

THE STATE OF OHIO, APPELLEE *v*. HILL, APPELLANT.

[Cite as *State v. Hill*, 1995-Ohio-287.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-355—Submitted May 9, 1995—Decided August 30, 1995.)

APPEAL from the Court of Appeals for Hamilton County, No. C-920497.

———————————

{¶ 1} In March 1991, defendant-appellant, Jeffrey Hill ("Hill"), stabbed to death his mother, Emma Hill, in her Cincinnati apartment. Then, he ransacked her apartment and took money to buy cocaine. Three days later, Hill confessed to killing his mother. A jury convicted Hill of his mother's aggravated murder, and he was sentenced to death.

{¶ 2} According to his confession, Hill went to visit his mother around 6:30 a.m., Saturday, March 23, 1991, because she had promised to help find him an apartment. When he arrived, he had been smoking cocaine. She gave him $20, and he left for thirty to sixty minutes. After he came back, she complained he did not visit her often enough, and they argued. She "was talkin' to me" and "[t]he next thing I know she's layin' on the floor." Hill "stabbed" her "more than once" with a kitchen knife.

{¶ 3} As Emma lay on her bed, she looked up at him and said, "Why? Why did you do this?" Hill did not bother to reply, but instead he kept "goin' through 'er stuff" looking for "money to get some more crack." He found $20 and left, locking the apartment door behind him. Then he drove around in her Oldsmobile Cutlass Ciera, threw away the knife, smoked more cocaine, and met a new friend, Charlotte Jones.

{¶ 4} Around 6:30 or 7:00 p.m. that evening, Hill, along with Jones, returned to the area near Emma's apartment. Hill told Jones he was going to get

some money from his mother, and Jones waited in the car. Hill later said he went back "to see if she [his mother] was all right." He used a jack handle to force the apartment door open because he had forgotten to take her apartment key. When detectives asked if his mother was alive then, Hill replied, "she didn' say nothin'. So I went in 'er closet an' got the rest of the money." Hill admitted taking $80 and putting $40 in the car trunk so Jones would not get it.

{¶ 5} Later that evening, police officer Paul Fangman noticed a 1985 Oldsmobile being driven without lights. After following the car, Fangman observed the driver make "quick definite movements" as if he was "trying to hide something." In the car, Fangman found a crack cocaine pipe next to the driver's seat. Hill, the driver, had no license, and was wanted on an unrelated outstanding warrant, so Fangman took him into custody. Fangman verified that the Oldsmobile was registered to Emma Hill and left it, secured, at a nearby parking lot. Fangman established Jones' identity and released her.

{¶ 6} On March 25, while in custody, Hill called and asked a friend to check on his mother. The friend checked Emma's apartment, but got no response. That evening, police entered the ransacked apartment and found Emma's body next to her bed. On a living room stool, police found a blood-soaked brown cloth purse. On a bathroom faucet, police found Hill's fingerprints, suggesting he may have last used that faucet.

{¶ 7} The coroner testified that Emma had been dead for at least thirty-six hours at the time of the March 26 autopsy. Emma died as a result of ten stab wounds to her chest and back. Some were inflicted with "considerable force." One knife wound perforated the heart and nicked a lung; two others punctured a lung and broke ribs. Another wound perforated the scapula or "wing bone." No defensive type wounds were evident. Emma, sixty-one years old, had been partly paralyzed from a stroke she had suffered several years before.

**{¶ 8}** On March 26, homicide detectives interviewed Hill and advised him of his *Miranda* rights. Hill signed a written waiver of those rights. Hill told detectives that around March 23 he had been driving in his mother's car, using cocaine, but he denied knowing about his mother's death. Detectives talked with Jones and Vernon Hill, Hill's brother. Police further learned Emma never let either son drive her car without her being present.

**{¶ 9}** Then, detectives readvised Hill of his rights and confronted him about inconsistencies in his statement. After ten or fifteen minutes, Hill "admitted that he stabbed his mother to death." Then police readvised Hill of his rights and tape recorded his confession. After that, Hill asked to see Vernon and told his brother, "he killed mama but he didn't mean to."

**{¶ 10}** That evening, at a location pointed out by Hill, police found a bloodstained knife. Hill identified that as the murder weapon. The coroner confirmed this knife could have caused Emma's wounds.

**{¶ 11}** Pursuant to a warrant, police searched Emma's Oldsmobile and found a tire tool, two $20 bills, and two $1 bills in the trunk. One $1 bill was stained with type A blood, which was Emma's blood type. Forensic examination of the tire tool revealed microscopic brass flakes matching the composition of a brass door protector on Emma's apartment door. That brass protector appeared to have "fresh jimmy marks," and black paint on that protector matched the painted tire tool.

**{¶ 12}** A grand jury indicted Hill on four counts. Count I charged aggravated murder during an aggravated robbery, R.C. 2903.01. The single felony-murder death-penalty specification charged murder during aggravated robbery, R.C. 2929.04(A)(7). Count II charged aggravated robbery, R.C. 2911.01; Count III charged aggravated burglary, R.C. 2911.11; and Count IV, theft of a motor vehicle, R.C. 2913.02. Following competency evaluations by experts, the court found Hill mentally competent to stand trial. After further evaluations, experts

found Hill mentally responsible for his acts. At trial, Hill did not pursue his insanity pleas. Despite not guilty pleas, the jury convicted Hill as charged.

{¶ 13} At the sentencing hearing, Hill testified, under oath, consistent with his earlier confession. When he went to see his mother at 6:30 a.m., he "had been up all night smoking [$400 worth of] crack." After she gave him $20 to buy cigarettes, he took her car and bought more cocaine. After he came back, he recalled talking with her and then seeing her "laying on the floor." When asked if he remembered stabbing her, Hill replied "[n]ot really." After he went "through everything," he left to buy more crack. He loved his mother "[m]ore than anything" and stated it "[a]in't like I meant to" stab her.

{¶ 14} Hill, who was twenty-seven just after the murder, testified that he left high school at age seventeen to take care of his mother for a year after her stroke. After he left school, Hill worked for several years at various jobs including helping handicapped children. At the time of the murder, he worked for a dry cleaning plant. Over the past five years, Hill claimed he had received some thirty-thousand dollars from settling four accident claims. His mother evidently kept some of this money for him, but he did not know how much she still had. For a time, Hill lived with Shawanna Head, who bore him a daughter, for whom he cared. Hill's father never lived with his family, but after his father died in 1990, Hill felt "lost" and "hurt" and began using crack cocaine.

{¶ 15} Dr. Myron Fridman, a psychologist working with addictions, described crack cocaine as producing "a very, very intense addiction" causing a "compulsive behavioral need" to continue use. After a cocaine "binge," a user can develop a "mental state" known as "cocaine psychosis." That may be characterized by "mental confusion, irrational behavior, *** like a paranoid state *** [or even] like schizophrenia with hallucinations." As a cocaine addict, Hill's behavior could have been directed "by his overwhelming intense need" for more cocaine. Fridman believed Hill could be rehabilitated.

4

{¶ 16} Hill also introduced into evidence competency and mental evaluations of Hill performed by four psychologists. After evaluations in July and September 1991, Dr. Nancy Schmidtgoessling concluded Hill was uncooperative, malingering, and mentally competent. After a February 1992 evaluation, she found "no history of any symptoms of any severe mental disease or defect" and concluded Hill was mentally responsible. Dr. Bill Fuess agreed that Hill was malingering, competent, and mentally responsible. Dr. Fuess further stated that Hill did suffer from "borderline personality" and "substance abuse" disorders, and that Hill was "a seriously depressed individual grieving the death of his mother."

{¶ 17} In August 1991, Dr. Massimo DeMarchis evaluated Hill as an inpatient and found him competent to stand trial. During the evaluation, Hill made "an extremely poor and naive attempt *** at faking mental illness." DeMarchis found Hill's "refusal to fully cooperate *** nothing more than a conscious, calculated attempt to delay *** court proceedings." Hill displayed no "signs of a major mental disorder."

{¶ 18} In contrast, Dr. Roger Fisher found Hill incompetent to stand trial, but later concluded Hill did not lack mental responsibility when he killed his mother. Fisher was "not persuaded of the validity" of Hill's claims of "hearing 'voices' and seeing 'demons.'" Although Fisher thought Hill was "extremely intoxicated" at the time of the offenses, Fisher had "no reason to believe he was mentally ill."

{¶ 19} Shawanna Head, Hill's girlfriend, lived with him for five or six years and they had a daughter whom Hill supported. Robin Hill, Hill's cousin, lost contact with him shortly after Hill's father died. Robin never knew Hill to use cocaine, and she described him as a decent person, who helped his mother.

{¶ 20} The jury recommended the death penalty. The trial court sentenced Hill to death for aggravated murder and terms of imprisonment for the remaining charges. The court of appeals affirmed.

_____

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle* and *D. Shannon Smith*, for appellant.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 21} In this appeal, Hill advances fifteen propositions of law. Finding none meritorious, we affirm his convictions. We have also independently weighed the aggravating circumstance against mitigating factors, and compared the sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm the sentence of death.

*Inaccurate Jury Sentencing Standard ( I-IV)*

{¶ 22} In propositions of law Nos. I through IV, Hill raises issues centered around his claim that the jury was fundamentally misled concerning the sentencing standard by which aggravating circumstances are weighed against mitigating factors. Yet, Hill did not object at trial to the faulty verdict form or the instructions, and thus waived all but plain error. "The failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Overall, we find the instructions adequate under the facts of this case and reject Hill's claims of plain error.

{¶ 23} As Hill correctly points out, the jury must find beyond a reasonable doubt that the "aggravating circumstances" are "sufficient to outweigh" those "mitigating factors present in the case" before recommending the death penalty. R.C. 2929.03(D)(2). Unfortunately, at least one life sentence verdict form used in this case, and possibly both, misstated this standard. Neither life verdict form is in the record. However, the trial judge told the jury that the life sentence verdict form

6

involved the jury's finding that the "mitigating factors are sufficient" to outweigh the aggravating circumstance. Thus, in referring to that form, the trial judge asserted, "The second [form] is we, the jury, do find beyond a reasonable doubt that the mitigating factors are sufficient to outweigh the aggravating circumstances present in this case." Additionally, the court and parties frequently and erroneously referred to "aggravating circumstances" although only one aggravating circumstance was alleged or proved.

{¶ 24} In proposition of law No. II, Hill points out that the prosecutor in argument misstated applicable law by asserting that "mitigating factors do not outweigh the aggravating circumstances." The prosecutor also misspoke by referring to "any mitigating factor" in the singular, and by referring to the jury recommending "death in the electric chair."

{¶ 25} Notwithstanding the prosecutor's misstatements and the inaccurate life sentence verdict form, we deem it unnecessary to reverse this sentencing determination under the circumstances of this case. First, Hill failed to raise these issues before the court of appeals. We "will not ordinarily consider a claim of error that was not raised in any way in the Court of Appeals and was not considered or decided by that court." *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 26} Second, Hill failed to object at trial. As noted before, failure to object to an instruction waives "any claim of error *** unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood,* syllabus. This principle applies equally to the faulty life sentence verdict form. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

**{¶ 27}** No plain error exists in this case. In fact, the record demonstrates the parties, including the judge in the instructions, generally did refer to a correct standard in the sentence proceedings. Thus, the jury understood the applicable sentencing standard and its sentencing responsibility. The trial court clearly and correctly instructed the jury more than four separate times in final penalty instructions that the aggravating circumstances had to outweigh mitigating factors before the jury could recommend the death penalty. The court defined the term "reasonable doubt," and specifically told the jury "the defendant has no burden of proof." The court specifically referred once to the state's burden of proof beyond a reasonable doubt that the aggravating circumstances outweighed the factors in mitigation. The court repeated the state's burden of proof beyond a reasonable doubt when reading the death penalty verdict form. The court further told the jury that only if "you are firmly convinced" that aggravating circumstances outweigh mitigating factors has the state proven its right to a death penalty verdict. If the jury was not "firmly convinced" that aggravation outweighed mitigation, then the state was not entitled to a death penalty recommendation.

**{¶ 28}** In voir dire, the prosecutor repeatedly referred to the correct standard. Also, the jury never asked any questions. Moreover, the jury form that the jury agreed to and signed reflected the correct standard: "We, the Jury, in the issue joined, do find beyond a reasonable doubt that the aggravating circumstances [*sic*] present in this case are sufficient to outweigh the mitigating factors and we therefore recommend that the sentence of Death be imposed on the defendant, Jeffrey D. Hill."

**{¶ 29}** When the jury instructions including the verdict forms are viewed in their entirety, the trial judge adequately informed the jury of its responsibility under R.C. 2929.03(D)(2). *State v. Lorraine* (1993), 66 Ohio St.3d 414, 425, 613 N.E.2d 212, 221. Accord *State v. Landrum* (1990), 53 Ohio St.3d 107, 122, 559 N.E.2d 710, 727.

**{¶ 30}** Moreover, we find nothing suggesting the aggravating circumstance and mitigating factors are in equipoise in this case. In fact, the aggravating circumstance strongly outweighs the scant mitigating factors beyond a reasonable doubt, as discussed later. In essence, Hill asked the jury and this court to spare his life because he is a cocaine addict and confessed to police. Under those circumstances, the faulty form or instructions could not have affected the jury's decision so that "but for" the faulty form, the "outcome of the trial clearly would have been otherwise." *State v. Underwood*, syllabus.

**{¶ 31}** Further, Hill's failure to object to the prosecutor's argument also waived all but plain error. *State v. Mills* (1992), 62 Ohio St.3d 357, 373, 582 N.E.2d 972, 986. No plain error resulted because the prosecutor did not deny Hill a fair trial or cause a miscarriage of justice. *State v. Combs* (1991), 62 Ohio St.3d 278, 282, 581 N.E.2d 1071,. 1076; *State v. Landrum*, *supra*, at 110, 559 N.E.2d at 717.

**{¶ 32}** The prosecutor's reference to the electric chair was accurate, since the General Assembly had not yet authorized death by lethal injection. See R.C. 2949.22, Sub.H.B. No. 11, effective October 1, 1993. The prosecutor's brief misstatements as to "any mitigating factor" and the weighing process were inconsequential. At times, the prosecutor correctly noted that the aggravating circumstance must outweigh mitigating factors to justify the death penalty. Moreover, the court told the jury it was the court's job to instruct the jury on the law, and the jury's duty to follow those instructions. As discussed, the court adequately instructed the jury as to its responsibilities.

**{¶ 33}** Additionally, our independent reassessment of the sentence could eliminate the effect of these errors. See *State v. Combs, supra,* at 286, 581 N.E.2d at 1079; *State v. Landrum, supra,* at 124, 559 N.E.2d at 729. Thus, we reject Hill's plain error assertions in propositions Nos. I and II.

**{¶ 34}** In propositions of law Nos. III and IV, Hill asserts he was denied the effective assistance of counsel at trial and before the court of appeals. In

proposition No. III, Hill complains because his counsel did not object at trial to the verdict form or the prosecutorial misstatements, as discussed in propositions Nos. I and II. In proposition No. IV, Hill complains his appellate counsel failed to raise these issues at the court of appeals.

{¶ 35} Reversal of a conviction or sentence based on ineffective assistance requires meeting the two-prong standard of *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires: (a) deficient performance, "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (b) prejudice, "errors *** so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 36} However, Hill fails to demonstrate either deficient performance or prejudice. Hill's counsel reasonably decided not to object to the prosecutor's brief, inaccurate comments. Objections "'tend to disrupt the flow of a trial [and] are considered technical and bothersome[.]'" *State v. Campbell* (1994), 69 Ohio St.3d 38, 53, 630 N.E.2d 339, 352. A decision not to interrupt because of such imprecise statements reflected "an objective standard of reasonable representation." See *State v. Bradley*, at paragraph two of the syllabus. Also, counsel could have believed the trial court's more than four correct references to the aggravating circumstances outweighing the mitigation factors negated these misstatements.

{¶ 37} As to the incorrect life verdict form or forms, all parties to the trial, including the two defense counsel, apparently overlooked that deficiency. Such an oversight is "not the kind of egregious and unprofessional conduct condemned by *Strickland*." *State v. Seiber* (1990), 56 Ohio St.3d 4, 11, 564 N.E.2d 408,. 417. Accord *State v. Scudder* (1994), 71 Ohio St.3d 263, 273, 643 N.E.2d 524, 533. Overall, counsel's conduct fell within the wide range of reasonably professional

conduct, and his counsel continued to function as the counsel guaranteed by the Sixth Amendment.

{¶ 38} Additionally, Hill has not established prejudice, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, at paragraph three of the syllabus. In fact, the aggravating circumstance strongly outweighs the scant mitigating factors beyond a reasonable doubt, as discussed later. Thus, even if counsel had objected and thereby secured a correct verdict form or eliminated the prosecutor's misstatements, no reasonable probability exists as to a different result.

{¶ 39} Appellate counsel's tactical decision not to raise in the court of appeals the claims in propositions Nos. I and II, or the ineffective assistance claim in proposition No. III, reflected reasonable professional judgment. The first two issues had been waived at trial and were unlikely to succeed. "This process of 'winnowing out weaker arguments on appeal and focusing' on those more likely to prevail *** is the hallmark of effective appellate advocacy." *Smith v. Murray* (1986), 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434, 445. Additionally, Hill has not demonstrated prejudice. Propositions Nos. I through III create no "reasonable probability" of a different result on appeal were it not for counsel's errors. *State v. Bradley,* at paragraph three of the syllabus. Hence, we also reject propositions Nos. III and IV.

*Defective Trial and Appellate Sentencing Opinions (V, VI)*

{¶ 40} In propositions of law Nos. V and VI, Hill argues the trial court, in its sentencing opinion, and the court of appeals, in its reassessment of the sentence, considered nonstatutory aggravating circumstances and ignored valid mitigation. We find no merit in either claim.

{¶ 41} Neither the trial court nor the court of appeals relied upon nonstatutory aggravating circumstances. Both courts accurately identified the single aggravating circumstance. When a court does so correctly, that court is

presumed to rely only on that circumstance, and not on nonstatutory aggravating circumstances. *State v. Rojas* (1992), 64 Ohio St.3d 131, 142, 592 N.E.2d 1376, 1386; *State v. Wiles* (1991), 59 Ohio St.3d 71, 90, 571 N.E.2d 97, 120. Neither the court of appeals' description of Hill's crime as "heinous," nor the trial court's alleged "disgust" for Hill's offense, created nonstatutory aggravating circumstances. The facts of the robbery form part of the aggravating circumstance. *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 305. Moreover, a court "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

{¶ 42} As to mitigation, "the assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott*, *supra*, at 171, 555 N.E.2d at 305. The fact mitigation evidence is admissible "does not automatically mean it must be given any weight." *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. See, also, *State v. Stumpf, supra*, at paragraph two of the syllabus. The trial court could reasonably assign whatever weight, if any, thought to be appropriate for Hill's drug dependency or cooperation with police.

{¶ 43} In discussing and evaluating the evidence, both the trial court and the court of appeals adequately explained why the aggravating circumstance outweighed any relevant mitigating factors. Even inadequate explanations do not require reversal. *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124, 131; *State v. Lewis* (1993), 67 Ohio St.3d 200, 204, 616 N.E.2d 921, 925. Moreover, our independent reassessment can cure this asserted sentencing deficiency. *State v. Fox,* at 191, 631 N.E.2d at 131; *State v. Combs,* 62 Ohio St.3d at 286, 581 N.E. 2d at 1079; *State v. Maurer* (1984), 15 Ohio St.3d 239, 247, 15 OBR 379, 386, 473 N.E.2d 768, 778.

*Comment on Nonapplicable Mitigating Factors (VII)*

{¶ 44} In proposition No. VII, Hill argues that the trial court's sentencing opinion justified the death sentence by noting the absence and irrelevance of certain statutory mitigating factors. We find no prejudicial error.

{¶ 45} Admittedly, *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542, 557-558, recognizes that "where the defendant does not raise a particular mitigating factor, that factor need not be considered in the opinions of the trial court and the appellate court or in the process of weighing[.]" However, here, the trial court, in an effort to be conscientious and thorough, simply explained why certain statutory mitigating factors did not apply. We find no fault. By so commenting, the court did not convert inapplicable mitigating factors into nonstatutory aggravating circumstances. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 39, 544 N.E.2d 895, 917; *State v. Combs*, *supra*, at 287, 581 N.E.2d at 1079.

*Settled Issues (IX)*

{¶ 46} Hill's proposition of law No. IX, challenging Ohio's death penalty statutes, is summarily rejected. See *State v. Bedford* (1988), 39 Ohio St.3d 122, 132, 529 N.E.2d 913, 923; *State v. Beuke* (1988), 38 Ohio St.3d 29, 38-39, 526 N.E.2d 274, 285; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

*Instructions on Intoxication (X, XI)*

{¶ 47} In proposition of law No. X, Hill argues plain error because the trial court did not, *sua sponte*, instruct the jury to consider Hill's cocaine intoxication in deciding either his guilt or the recommended penalty. In proposition No. XI, Hill argues he was denied the effective assistance of counsel because defense counsel failed to ask for such jury instructions. We reject both propositions.

{¶ 48} First, Hill failed to request any instruction as to the effect of intoxication. Thus, Hill waived all but plain error. *State v. Underwood, supra*, at syllabus; Crim.R. 30(A), 52(B). The evidence of Hill's guilt, as well as the

evidence supporting the death penalty, negates any claim that "but for the error," the trial result "clearly would have been otherwise." *State v. Underwood*, syllabus.

{¶ 49} Second, we have traditionally recognized a trial judge's discretion as to whether to instruct a jury on intoxication as a defense. See *State v. Fox* (1981), 68 Ohio St.2d 53, 22 O.O.3d 259, 428 N.E.2d 410; *Nichols v. State* (1858), 8 Ohio St. 435, paragraph two of the syllabus. As *Nichols* stated at 439, we will not impose a requirement for a trial judge to so instruct a jury, since "[i]ntoxication is easily simulated" and "often voluntarily induced for the sole purpose of nerving a wicked heart[.]"

{¶ 50} Moreover, the evidence does not reasonably raise the intoxication issue. "[I]ntoxication is not raised as a defense to the element of purpose in a criminal prosecution merely because the evidence suggests reduced inhibitions, impaired judgment or blurred appreciation by the defendant of the consequences of his conduct." *State v. Hicks* (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030, syllabus.

{¶ 51} In this case, Hill drove away from his mother's house, obtained cocaine, and drove back. Then he stabbed her ten times, searched for and found money, and drove away again. When he left after killing his mother, he locked her door behind him. Then, he took the precaution of discarding the murder weapon. Three days later, he recalled and described the events of the murder to police. His careful, calculated steps refute any claim that cocaine use interfered with his capacity to entertain the purposeful intent to kill. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 603, 605 N.E.2d 916, 924; *State v. Hicks, supra,* at 74, 538 N.E.2d 1034.

{¶ 52} As to the penalty phase, the trial court fully instructed the jury on sentence deliberations and to consider all of the evidence and arguments presented. The trial court need not instruct the jury to give particular weight to any specific evidence, such as Hill's cocaine use. "The fact that an item of evidence is admissible *** does not automatically mean that it must be given any weight."

*State v. Steffen*, *supra*, at paragraph two of the syllabus. Also, Hill did not establish that his cocaine addiction qualified as a mental disease or defect under R.C. 2929.04(B)(3). See *State v. Cooey*, 46 Ohio St.3d at 41, 544 N.E.2d at 919; *State v. Van Hook* (1988), 39 Ohio St.3d 256, 262-263, 530 N.E.2d 883, 889-890.

{¶ 53} We also reject Hill's proposition of law No. XI, claiming ineffective assistance of counsel. Defense counsel need not make fruitless requests for jury instructions, such as those on intoxication. Thus, counsel's decision not to request such instructions reflected professional judgment not falling "below an objective standard of reasonable representation." *State v. Bradley*, *supra*, at paragraph two of the syllabus. Hill also failed to demonstrate prejudice. No "reasonable probability" exists that the result of the trial would have been different if counsel had requested such instructions. *State v. Bradley*, at paragraph three of the syllabus.

*Defendant's Absence During Jury-View Instructions (XII)*

{¶ 54} In proposition No. XII, Hill argues his conviction must be reversed because he was absent when the trial judge instructed the jury immediately prior to a jury visit to the crime scene. Admittedly, Hill has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A).

{¶ 55} However, both Hill and his counsel knew about the jury view and the court's intention to briefly instruct the jury before the view. Neither Hill nor his counsel expressed any desire to be there, and Hill specifically waived his presence at the jury view. "A party will not be permitted to take advantage of an error which he himself invited or induced." *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus; *State v. Seiber,* 56 Ohio St.3d at 17, 564 N.E.2d at 422.

{¶ 56} Moreover, a trial court's *ex parte* communication with the jury is not necessarily prejudicial error. *State v. Williams* (1983), 6 Ohio St.3d 281, 286, 6 OBR 345, 349, 452 N.E.2d 1323, 1330. To establish prejudice from such *ex parte*

communications, "the complaining party must first produce some evidence that a private contact, without full knowledge of the parties, occurred between the judge and jurors which involved substantive matters." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph thirteen of the syllabus.

{¶ 57} Hill fails to meet the tests. The parties had prior "full knowledge" and agreed to the contact. Moreover, the trial court's innocuous comments involved procedures during the view, not substantive matters. Any irregularity was harmless. *State v. Williams,* 6 Ohio St.3d at 286, 6 OBR at 349, 452 N.E.2d at 1330.

*Batson Claims on State's Peremptory Challenges (XIII)*

{¶ 58} In proposition of law No. XIII, Hill argues the prosecutor exercised two peremptory challenges in a racially discriminatory manner. *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, held that the United States Constitution's Equal Protection Clause precludes "purposeful discrimination by the state in the exercise of peremptory challenges so as to exclude members of minority groups from service on petit juries." *State v. Hernandez* (1992), 63 Ohio St.3d 577, 581, 589 N.E.2d 1310, 1313.

{¶ 59} To make a prima facie case of such purposeful discrimination, an accused must demonstrate: (a) that members of a recognized racial group were peremptorily challenged; and (b) that the "'facts and any other relevant circumstances raise an inference that the prosecutor'" used the peremptory challenges to exclude jurors "'on account of their race.'" *State v. Hernandez, supra,* at 582, 589 N.E.2d at 1313, citing *Batson*. If the defendant makes a prima facie case of discrimination, the state must then come forward with a neutral explanation. *Id.* A trial court's finding of no discriminatory intent "will not be reversed on appeal absent a determination that it was clearly erroneous." *Id.* at 583, 589 N.E.2d at 1314, following *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859, 114 L.E.2d 395.

{¶ 60} In this case, Hill established no prima facie case at trial. The facts and circumstances raise no inference that the state improperly used peremptory challenges to exclude potential jurors based on race. The prosecutor properly challenged one African-American for cause, and did not challenge another who served on the jury.

{¶ 61} However, Hill complains about the prosecutor's peremptory challenges against two other African-Americans, Robert McDaniel and Gerald Hutcherson. Yet, McDaniel, a seventy-year-old veteran, emphatically and repeatedly asserted he did not want to serve on this jury. McDaniel explained he could not handle "too much pressure." He had fought in combat for two and one-half years during World War II in China and Burma and "caught lead four different times." Because of this, McDaniel feared "flashbacks" and was "shell shocked" and "jumpy." In fact, the prosecutor challenged him for cause, but the court rejected that challenge. Then, the prosecutor excused McDaniel with a peremptory, and Hill raised no *Batson* claim. Later, Hutcherson was examined and declared he could not think of any instance where the death penalty was warranted. Hutcherson also planned to continue working second shift, until 11:00 p.m., even while serving on the jury. Hill raised the *Batson* issue only after the prosecutor excused Hutcherson.

{¶ 62} Additionally, the prosecution voluntarily explained, in race-neutral terms, specific reasons for its peremptory challenges even in the absence of a prima facie showing. Thus, the trial court need not have interfered with the prosecution's peremptory challenges. *Hernandez v. New York, supra.* We find no merit in Hill's proposition No. XIII.

*Admission of Defendant's Pretrial Statements(XIV)*

{¶ 63} In proposition of law No. XIV, Hill urges that his pretrial statements were secured in violation of his Fifth and Sixth Amendment rights. Hill argues that the principle of *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68

17

L.Ed.2d 378, should be extended. *Edwards* established a bright-line rule that once an accused, in custody, asks for a lawyer, questioning must cease until his lawyer is present. Hill wants to extend *Edwards,* so that a person in custody for one offense cannot waive counsel as to another offense.

{¶ 64} However, Hill's claims that his Fifth or Sixth Amendment rights were violated lack merit. As to his Fifth Amendment rights, neither *Edwards* nor the further holding in *Arizona v. Roberson* (1988), 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704, is relevant. Hill never invoked his Fifth Amendment right to counsel. When police questioned Hill on March 26 about his mother's death, he had been in custody for three days on unrelated matters, *i.e.*, an outstanding warrant, traffic violations and possession of the crack cocaine pipe. Police did not question him about those matters. In fact, no evidence of record exists that Hill asked to consult with counsel on those matters. Nor does the record establish that Hill had court-appointed or any other counsel to represent him as to the March 23 charges.

{¶ 65} Instead, Hill asks us to assume that counsel had been appointed to represent him for the March 23 charges. Yet, even such an assumption would not have prevented police questioning on the unrelated issue of his mother's death. *McNeil v. Wisconsin* (1991), 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158, held that an accused's Sixth Amendment right is offense specific. Thus, under *McNeil*, appointment of counsel with respect to one offense does not bar police questioning as to a second uncharged offense.

{¶ 66} In this case, police fully advised Hill of his *Miranda* rights and secured a waiver of those rights, prior to questioning Hill about his mother's death. In fact, police separately advised Hill of his rights three times before obtaining his taped confession, and Hill was not then charged with any offense relating to his mother. Hill testified he asked for a lawyer, and the police told him he did not need one. However, the police testified Hill specifically told them he did not have and did not want an attorney.

{¶ 67} The evidence supports the trial court's decision to admit Hill's confession as lawfully, freely and voluntarily made. Further, the trial court has the responsibility to weigh the evidence and determine the credibility of witnesses even during suppression hearings. *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584; *State v. DePew*, 38 Ohio St.3d at 277, 528 N.E.2d at 547.

*Appointment of Sanity Examiners (XV)*

{¶ 68} In proposition of law No. XV, Hill argues he was denied his right to an impartial mental-condition examination under R.C. 2945.39 because the same examiners had already evaluated his mental competency to stand trial. Hill argues those examiners, because of their prior opinions, could be prejudiced when evaluating his mental responsibility.

{¶ 69} In fact, the four examiners did not all agree on their evaluations of competency. Dr. Fisher found Hill not competent, but agreed malingering was possible. Dr. Fuess found Hill was malingering and was competent. Dr. Schmidtgoessling recommended further evaluation. After Hill was an inpatient at a mental health facility, Dr. DeMarchis found Hill made an "extremely poor and naive attempt *** at faking mental illness," and found him competent. Hill even threw a temper tantrum, overturning tables and chairs, after he was told he was malingering. After interviewing Hill again, Dr. Schmidtgoessling decided Hill was competent and malingering.

{¶ 70} In view of the circumstances, we find the trial court did not err in appointing the same examiners who had evaluated competency to evaluate separately mental responsibility. R.C. 2945.371(E) specifically authorizes appointing the same examiner to evaluate competency for trial and mental condition at the time of an offense. Separate reports must be prepared, but that was done here. Moreover, the examiners' reports are professional and thorough. Appointing the same examiners makes sense in view of the complexity of myriad details

involved in mental evaluations.  Hill's attempts to fake mental illness had already delayed the case, and appointing new examiners would necessitate further delay.  In essence, Hill wants two sets of examiners so he can get "two bites of the apple" to evade responsibility.  We find no abuse of discretion in reappointing the same examiners.

**{¶ 71}** Further, the trial court need not have specifically asked Hill to recommend an examiner.  Hill had no constitutional right to an examiner of his own choosing.  See *State v. Esparza* (1988), 39 Ohio St.3d 8, 10, 529 N.E.2d 192, 195.  Also, Hill invoked no rights at trial to recommend an examiner under R.C. 2945.39(A)(3) or secure an independent expert examination under R.C. 2945. 39(C).  See *State v. Hix* (1988), 38 Ohio St.3d 129, 527 N.E.2d 784, syllabus.  We reject proposition No. XV.

*INDEPENDENT SENTENCE ASSESSMENT*

**{¶ 72}** In proposition of law No. VIII, Hill argues the death sentence is unwarranted because the aggravating circumstance does not outweigh mitigating factors.  R.C. 2929.05(A) requires us to review Hill's sentence independently.

**{¶ 73}** After independent assessment, we find the evidence clearly proves beyond a reasonable doubt the aggravating circumstance for which Hill was convicted, *i.e.*, murder during the course of an aggravated robbery.  As to mitigating factors, Hill's apparent cocaine addiction is a mitigating factor as it relates to the offense.  Aside from that addiction, we find nothing else mitigating in the nature and circumstances of the offense.

**{¶ 74}** We find Hill's history, character, and background provides nothing of significant mitigating value.  Evidence as to Hill's steady work record was sparse.  Dr. Fuess did verify that Hill suffered from "personality disorders."  Yet, we choose to give these disorders little weight, even including his "substance abuse" disorder.  See *State v. Slagle*, 65 Ohio St.3d at 614, 605 N.E.2d at 931; *State v. Cooey*, 46 Ohio St.3d at 41, 544 N.E.2d at 919.  Hill also said he loved his mother

and cared for his child, and the psychological evaluations confirm Hill was deeply depressed for killing her. We find nothing else about his history or background to be mitigating. Nothing in his character appears mitigating.

{¶ 75} No evidence at trial supports applying any of the statutory mitigating factors in R.C. 2929.04(B)(1) through (6). Despite Dr. Fridman's testimony, Hill did not establish that his personality or conduct disorders were a "mental disease or defect" under (B)(3). Cf. *State v. Seiber*, 56 Ohio St.3d at 8, 564 N.E.2d at 415. As to "other factors" in R.C. 2929.04(B)(7), Hill's cooperation with police is a relevant mitigating factor entitled to slight weight. After initial denials, Hill admitted responsibility when faced with strong proof of his involvement. We find no expressions of remorse in Hill's statement worthy of any mitigating weight.

{¶ 76} The aggravating circumstance strongly outweighs the slight mitigation present in this case beyond a reasonable doubt. Aside from Hill's cocaine addiction and cooperation with police, no mitigating factors of any consequence exist. At best, those two factors are entitled to only very little weight. In contrast, the facts of the aggravating circumstance are horrendous. When weighed against that circumstance, the mitigating factors and evidence pale into insignificance. Hill brutally robbed and murdered his own mother, an elderly, partially paralyzed woman, in her own bedroom, and then left her to die alone. She had done nothing to provoke or contribute to this vicious assault. No merit is found in proposition No. VIII.

{¶ 77} The death penalty in this case is both appropriate and proportionate when compared with the penalty imposed in similar cases of felony murder. See *State v. Woodard* (1993), 68 Ohio St.3d 70, 623 N.E.2d 75; *State v. Lewis*, 67 Ohio St.3d 200, 616 N.E.2d 921; *State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253; *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972, including cases cited at 62 Ohio St.3d at 377, 582 N.E.2d at 989.

{¶ 78} The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY and COOK, JJ., concur.

WRIGHT and PFEIFER, JJ., dissent.

_____

**WRIGHT, J., dissenting.**

{¶ 79} I respectfully dissent from the opinion of the majority because I believe that the sentence of death is inappropriate, given the particular facts of this case. Although this court has upheld death sentences based upon a similar aggravating circumstance, I feel that this case has an entirely different character.

{¶ 80} Hill did not commit murder with prior calculation and design. The record reflects that Hill simply snapped due to his drug-induced state prior to the offense. He had been up all night smoking crack cocaine. He smoked crack cocaine in his mother's basement immediately before speaking with her the morning of the murder. After receiving twenty dollars from his mother, he bought and smoked more crack cocaine. Hill testified under oath that when he returned to his mother's house, he remembers speaking with her and the next thing he knew, she was on the floor. Hill testified that he did not remember stabbing his mother and told his brother that he did not mean to kill her. The state does not dispute this as part of Hill's confession.

{¶ 81} Dr. Fridman, a licensed clinical psychologist, spoke on Hill's behalf during the mitigation phase. Dr. Fridman testified concerning a condition known as "cocaine psychosis" that develops during heavy use of cocaine. Dr. Fridman stated that this condition is characterized by mental confusion, irrational behavior, a paranoid state, irritability, rapid changes in perception, release of inhibition, and panic reactions. Dr. Fridman also testified that when cocaine is no longer available, the addict goes through a period known as "abstinence syndrome." Dr. Fridman stated that during this period, the addict is "often capable of behaving and doing

22

anything to get their drug, behaving in very irrational ways. They can certainly be violent, aggressive."

**{¶ 82}** With regard to Hill's use of crack cocaine, Dr. Fridman opined that Hill's addiction would be classified as "chronic, long-term cocaine addiction," and that Hill "was an addict [and] had been an addict for some time." When asked whether Hill's actions on the night of the murder had any connection with the murder, Dr. Fridman testified that "a crack addict who has just binged on a lot of crack, has an abstinence syndrome and his behavior at that time can be directed by his need, his overwhelming intense need for more of the drug, for more crack."

**{¶ 83}** It is undisputed that the offense occurred in large part as a result of Hill's drug use and dependency. In light of the foregoing, I question whether Hill was able to form the purposeful intent to kill and believe that his chronic addiction should be viewed as a significant factor in determining punishment in the case before us.

**{¶ 84}** By stating that Hill's drug use played a significant role in the murder of his mother, I am not advocating the proposition that drug use, standing alone, should be viewed as a substantial mitigating factor. I simply believe that under the particular circumstances of this case, Hill's drug use is "relevant to the issue of whether the offender should be sentenced to death." R.C. 2929.04(B)(7).

**{¶ 85}** Hill cannot and should not be excused from punishment for his crime. The law of this state demands that a heavy penalty be imposed for the taking of a life. However, I cannot join in the decision of the majority to sentence Hill to death. For the foregoing reasons, I would uphold Hill's convictions, vacate his death sentence, and remand the case to the trial court for resentencing pursuant to R.C. 2929.06.

PFEIFER, J., concurs in the foregoing dissenting opinion.

———————————