**The STATE of Ohio, Appellee,**

v.

**REAVES, Appellant.**

[Cite as *State v. Reaves* (1998), 130 Ohio App.3d 776.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970631.

Decided Dec. 18, 1998.

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Steven W. Rakow,* Assistant Prosecuting Attorney, for appellee.

*Elizabeth E. Agar,* for appellant.

---

MARIANNA BROWN BETTMAN, Judge.

Defendant-appellant Derrick Reaves, along with Maurice Rogers, Richard Drain, and Carl Lamont Meadows, was indicted by the Hamilton County Grand Jury for the murder of James Richard Wilson. Reaves was originally tried with codefendant Rogers, but the jury was unable to agree on a verdict as to Reaves.[1] Reaves was tried again, and a jury found him guilty of one count of murder in violation of R.C. 2903.02(A). The court entered a conviction on the jury's verdict and sentenced Reaves to fifteen years to life in prison.

## FACTS

In the early morning of April 17, 1996, Richard Wilson visited Rodean Frazier's residence at 3410 Woodburn Avenue. At about 12:30 a.m., several of Frazier's neighbors were awakened by the sound of voices coming from the street. They heard people arguing, followed by the sound of someone being beaten by a stick. Two of the witnesses saw a group of five or six men circle around Wilson and beat him with weapons and kick him after he had fallen to the ground. None of these neighbors was able to identify the assailants.

After receiving several 911 calls from neighbors, the police arrived on the scene and found Wilson dead in the middle of the street. At trial, the coroner testified that Wilson had suffered dozens of internal and external injuries as a result of the beating, including three fatal head fractures. He stated that the number of injuries and angles from which the blows were delivered indicated the use of different objects by several individuals. The pattern of the injuries indicated that Wilson was beaten with objects such as a shovel blade, a shovel handle, and a shoe or boot.

---

1. The jury found Rogers guilty of committing the murder.

The police began investigating the crime immediately. Witnesses stated that after the beating, the assailants ran to the house occupied by Rodean Frazier. Frazier's house was known by his neighbors as a crack house. The police approached Frazier's house. Frazier and Richard Drain were in the living room. When asked if they knew anything about the homicide, they both said no. However, Frazier indicated to the investigating officer that he knew something. Realizing that Frazier was the subject of an open warrant concerning an unpaid traffic ticket, the officer took him to a police station. At 3:25 a.m. and 10:24 a.m. on April 17, 1996, Frazier gave taped statements to two Cincinnati police officers. In these statements, Frazier identified Reaves as a participant in the beating. Reaves was indicted the following week.

## TRIAL TESTIMONY

At trial, Frazier testified that, on the evening of April 16, 1996, a group of men, including Reaves, Rogers, Meadows, and Drain, was present at his residence as guests of Frazier's cousin, who occupied the upstairs apartment of the house. The men were at various times on his porch, in his side yard, or in his basement drinking beer and smoking marijuana. At one point the men were in his living room, and Drain was making racial slurs and bragging about "downing the next white guy" who walked into the room. The others began joining in the racial slurs and were egging Drain on. Frazier described the situation as volatile.

When Wilson, a white man, came to his side door, Frazier told him to leave. While Wilson was walking away, someone told Wilson that Frazier wanted to see him inside. Wilson came in the front door and called for Frazier. Upon hearing Wilson again, Frazier left the kitchen where he was cooking dinner and met Wilson in the living room. He grabbed Wilson by the arm and led him towards the side door in an effort to separate him from Drain, who had followed Wilson inside and was chasing him with a two-by-two tomato stake. After warning Drain that he had a gun, Wilson left the house by the side door and walked out to the street. Drain retraced his steps and left the house through the front door, eventually meeting Wilson again in the street, a few doors down from Frazier's apartment. The two began throwing punches. Then a group of men joined Drain, encircling Wilson. Frazier watched from the threshold of his front doorway as Wilson was knocked to the ground and beaten to death.

At trial, Frazier testified that Reaves was not at his house during the beating, although he had been there earlier. However, Frazier also admitted that he had told the police immediately after the crime that Reaves was involved in the beating. Frazier explained that he had been mistaken when he implicated Reaves in the beating in his earlier taped statements to the police. Frazier's

taped statements identifying Reaves as an assailant were played to the jury and admitted as substantive evidence.

In addition to Frazier's testimony, the state presented the testimony of Regina Jeter, who lived in Frazier's apartment. She knew Wilson and his assailants. She testified that she was in her back bedroom when she heard Wilson say that he had a gun and was going to shoot everyone. She went outside on the porch after hearing the commotion and testified that she saw Drain, Rogers, Meadows, and Reaves beating up Wilson. However, Jeter also admitted that she told the police initially that she had not seen the assault.

Frazier testified that Jeter was in the back bedroom during the beating, not on the porch, and that she did not see anything.

Several other neighbors testified, but none could identify any of the assailants.

The defense presented the testimony of Rashida Lidell, who lived upstairs from Frazier. She testified that Reaves and Rogers had been at her apartment on the afternoon of April 16, 1996, that they left after she braided their hair, and that they did not return to her apartment or to Frazier's. She also testified that Jeter told her immediately after the murder that she was asleep the whole time and did not see anything. On cross-examination Lidell admitted that she was not downstairs after 9 p.m.

After hearing all the evidence, the jury found Reaves guilty of murder. Reaves appeals his conviction, raising five assignments of error. Finding no merit to the assignments of errors, we affirm the judgment of the trial court.

## ASSIGNMENTS OF ERROR

In his first assignment of error, Reaves argues that the trial court erred in denying his motion to suppress Frazier's taped statements of identification made to the police on April 17, 1996, hours after the beating, and that the trial court erred in admitting the statements into evidence. Reaves argues also in this assignment of error that the trial court erred in overruling his objection to a document containing notes and a diagram of the crime scene, and in admitting this document into evidence. Because these arguments raise separate issues and concern separate evidence, we address them separately.

## THE APRIL 17, 1996, STATEMENTS OF IDENTIFICATION

Reaves first raised his objection to the use of the April 17, 1996, statements of identification in a motion *in limine*.[2] The trial court overruled the motion. The

---

2. While both parties and the court referred to Reaves's pretrial motion concerning the April 17, 1996, identification statements as a motion to suppress, the statements were not subject to

state played the tapes containing Frazier's identification of Reaves at trial, and the court admitted the tapes into evidence over the objection of defense counsel. Reaves has assigned this as error on appeal.

Reaves argues that the tapes contain inadmissible hearsay and that Frazier's statements on the tapes identifying Reaves as one of the assailants are inherently unreliable, because (1) Frazier was on drugs when he made the statements, (2) Frazier was not under oath or subject to cross-examination when he made the statements, and (3) Frazier testified under oath at trial that Reaves was not an assailant.

At trial, the state argued that these statements were not hearsay, but proper substantive evidence. On appeal, the state has abandoned its position that the statements were admissible as substantive evidence and argues instead that the statements were only used for impeachment purposes. This position is not supported by what happened at trial. The record demonstrates that the state used these statements as substantive evidence. That said, we hold that Reaves's argument that the tapes contain impermissible hearsay is erroneous, and that the trial court was correct in allowing the admission of the statements as substantive evidence.

## EVIDENCE RULE 801(D)(1)(c)

Evid.R. 801(D)(1)(c) provides:

"A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification."

In this case, Evid.R. 801(D)(1)(c) was used to admit a prior statement of identification that was not only made out of court and not under oath, but inconsistent with the declarant's trial testimony. Reaves argues that this rule of evidence violates his constitutional right to confront his accuser because he was not able to cross-examine Frazier when Frazier made the statement of identification to the police.

In *California v. Green*,[3] the United States Supreme Court held that a state may amend its hearsay rules to allow a witness's prior inconsistent out-of-court statement to be introduced as substantive evidence at trial without offending a defendant's Sixth Amendment right to confront witnesses, if the witness testifies

suppression under Crim.R. 12(B)(3) because Reaves did not argue that they were illegally obtained.

3. *California v. Green* (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489.

at trial and is subject to cross-examination concerning the statement. The *Green* court emphasized that it is the "literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause." [4] Allowing the jury to hear the declarant's testimony concerning the statement, under oath and subject to full and effective cross-examination, "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." [5]

Evid.R. 801(D)(1)(c) is the rule of evidence permitted by *Green*. The Ohio rule goes further than its federal counterpart because it not only requires that the declarant be subject to cross-examination at trial about his out-of-court statement, but also that a finding of reliability be made concerning the circumstances surrounding the out-of-court statement of identification.[6] The trial court's use of Evid.R. 801(D)(1)(c) in this case conforms to the intent of the drafters.

## APPLICATION OF EVID.R. 801(D)(1)(c)

As required under Evid.R. 801(D)(1)(c), Frazier testified at trial and was subjected to full and effective cross-examination. The fact that the court called Frazier as its own witness has no effect on our analysis.[7] Despite Reaves's

---

**4.** *Id.* at 157, 90 S.Ct. at 1934–1935, 26 L.Ed.2d at 496.

**5.** *Id.* at 158, 90 S.Ct. at 1935, 26 L.Ed.2d at 497.

**6.** See the comments to F.Evid.R. 801(d)(1)(C), 1975 Report of the Senate Committee on the Judiciary:

"Upon reflection, then, it appears the rule is desirable. Since these identifications take place reasonably soon after an offense has been committed, the witness' observations are still fresh in his mind. The identification occurs before his recollection has been dimmed by the passage of time. Equally important, it also takes place before the defendant or some other party has had the opportunity, through bribe or threat, to influence the witness to change his mind.

"Both experience and psychological studies suggest that identifications consisting of nonsuggestive lineups, photographic spreads, or similar identifications, made reasonably soon after the offense, are more reliable than in-court identifications. Admitting these prior identifications therefore provides greater fairness to both the prosecution and defense in a criminal trial. See McCormick, Evidence, 602, (2d ed. 1972). Their exclusion would thus be detrimental to the fair administration of justice."

The Committee Comment to the Ohio rule says it is identical to the federal rule except for the added provision providing for exclusion if the prior identification was made under unreliable circumstances. The comment further provides that the rationale for the rule "is that the perception made nearer the event is at least as likely, if not more likely, to be accurate than a subsequent identification in the court room."

**7.** The court called Frazier as its own witness under Evid.R. 614(A), with no objection from Reaves. Because the state knew that Frazier had recanted his identification of Reaves, had the state called Frazier as its own witness, it would have been prohibited from impeaching Frazier because of the absence of surprise. Evid.R. 607.

argument to the contrary, the taped statements were definitely statements of identification, and the identification of Reaves as a participant in the beating was the crux of the case.[8]

As required under Evid.R. 801(D)(1)(c), the trial court made a specific finding that the statements, which were made only hours after the beating, were made under circumstances indicating reliability. We find no error in this determination. Although Frazier told the jury during the defense cross-examination that he was on drugs when he gave the identification statements to the police, during the state's cross-examination, Reaves stated that he did not smoke any crack in the three hours after the incident when he gave his first statement to the police. He also testified that he probably smoked some crack between his first and second statements, but he did not know if he was high when he gave his second statement. Cincinnati Police Detective David Feldhaus, who interviewed Frazier, testified that Frazier seemed scared when the statements were taken, but that he did not seem high.

Frazier also testified that he recanted because, six months after the event, he quit using drugs, and the "fogginess" had lifted and his memory improved. However, the state produced evidence indicating that Frazier changed his story because of threats from the families of the other codefendants.

Thus, in this case, the jury had before it two versions of what happened from Frazier—the earlier statements inculpating Reaves given to the police under circumstances that fully comported with the requirements of Evid.R. 801(D)(1)(c), and the statement at trial more than two years later exonerating Reaves. Both were properly received in evidence, and it was entirely within the province of the jury to pick which version it believed.

Finally, the court did not err in rejecting Reaves's objection to the admission of the statements based upon Evid.R. 403(A). The statements were extremely probative of Reaves's involvement in this case, and the probative value was not outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

In summary, we hold that Frazier's taped statements of identification were properly admitted as substantive evidence.

## THE DIAGRAM DOCUMENT

Reaves argues that the trial court erred in admitting into evidence over his objections a document labeled State's Exhibit 4. This document contains notes

---

**8.** Accord *State v. Anderson* (Mar. 23, 1994), Montgomery App. No. 13003, unreported, 1994 WL 95228.

written by Frazier prior to the trial of one of Reaves's codefendants and a diagram drawn by Frazier depicting the position of Wilson and his assailants during the beating. Next to the diagram is a list of names written by Frazier, including "Top," which is Reaves's nickname. Frazier testified that he drew the diagram prior to one of the other trials for the murder of Wilson, but that by listing "Top" he was not identifying him as an assailant, just as a defendant.

■■■ The proper use of the diagram document was for impeachment only, even in the absence of surprise, because Frazier was the court's own witness.[9] The state was properly attempting to use this diagram to impeach that portion of Frazier's trial testimony which recanted Reaves's involvement in the murder. However, no limiting instruction was given[10] and the document was actually admitted into evidence. Unlike the taped statements to the police analyzed above, the identification information in this document did not fall within the nonhearsay category of Evid.R.801(D)(1)(c), because it was not clearly a statement of identification, it was not made soon after Frazier saw Reaves attack Wilson, and it was not accompanied by other indicia of reliability.[11] Thus, its admission into evidence was error, and it should have been used only for impeachment, subject to a limiting instruction. That said, we must determine whether the error was prejudicial. We hold that it was not.

■■ In reviewing whether an error in the admission of evidence warrants a reversal, we apply the harmless-error doctrine. In order to sustain the conviction, we must find that there is no reasonable possibility that the evidence may have contributed to the defendant's conviction.[12] The error must be harmless beyond a reasonable doubt. *Bayless, supra.*

The testimony concerning the document is confusing, and the diagram, standing alone, is unclear. The document had essentially no probative value as substantive evidence in this case, which fundamentally turned on which of Frazier's statements the jury believed—the taped statements inculpating Reaves or the trial testimony exculpating Reaves. Although there is not overwhelming

**9.** *State v. Dacons* (1982), 5 Ohio App.3d 112, 5 OBR 227, 449 N.E.2d 507.

**10.** Defense counsel did not request a limiting instruction during testimony related to the document. Thus, the only issue we are reviewing is whether the trial court erred in admitting this document into evidence.

**11.** At one point Frazier stated that he made the diagram in November 1996, but later he testified that he made it in February 1997. One of the state's witnesses, Police Officer Beaver, testified that he saw Frazier draw the diagram for a prosecutor on the morning of Carl Meadows's trial in November of 1996.

**12.** Crim.R. 52(A); *Chapman v. State* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *State v. Bayless* (1976), 48 Ohio St.2d 73, 2 O.O.3d 249, 357 N.E.2d 1035, paragraph seven of the syllabus.

evidence of guilt in this case, there is sufficient evidence. Ultimately, the jury chose to believe the original taped statements of identification and to disbelieve Frazier's trial testimony as to identification. We cannot say that, had the diagram been excluded, the jury would have reached a different verdict. Because there is no reasonable possibility that the error contributed to Reaves's conviction, we hold that the admission of the diagram into evidence was harmless error. The first assignment of error is overruled.

## REMAINING ASSIGNMENTS OF ERROR

In his second assignment of error, Reaves argues that the trial court erred in admitting hearsay evidence concerning threats allegedly made against Frazier. Reaves alleges that the admission of this evidence violated his due process and confrontation rights.[13]

Officer Beaver testified that, in February 1997, just prior to Maurice Rogers's trial, Frazier told him that his life had been threatened as a result of his testimony in previous trials that implicated Reaves's codefendants, that he did not want to appear, and that he was no longer sure that Reaves was one of the assailants. Beaver also testified that Frazier's sister told him prior to Rogers's trial to leave her brother alone because he was getting threats.

In one part of his argument, Reaves alleges that the state produced evidence indicating that he threatened Frazier, and that this evidence of other crimes was impermissible under Evid.R. 404(B). This is simply not correct. At no point did the state argue that Reaves had threatened Frazier.

In the next part of his argument, Reaves argues that "[s]ince the state offered no evidence that Defendant was aware of the threats, if any threats were even made, no probative value can be assigned to this evidence." While Reaves's argument on this point is not entirely clear, we hold that this evidence was properly used to impeach Frazier, who on the stand could not remember if he had been threatened prior to the other trials, and denied telling Officer Beaver that he had been threatened. This impeachment was highly significant, because it disclosed an explanation for why Frazier originally inculpated and later attempted to exonerate Reaves. Reaves did not object to the hearsay statements testified to by Officer Beaver and did not request a limiting instruction. Because there is no plain error, we will not reverse.[14] This assignment of error is overruled.

---

**13.** The use of the statements indicating that Frazier was threatened prior to the trials of the other defendants was the subject of a motion in limine filed by the defense. The court denied the motion.

**14.** See *State v. Fields* (1994), 97 Ohio App.3d 337, 344, 646 N.E.2d 866, 870–871.

■ In his third assignment of error, Reaves argues that the trial court erred in admitting crime-scene photographs and autopsy slides over the objection of defense counsel. Finding that the pictures were not gruesome, the court admitted twenty-five crime-scene photographs, twenty-six autopsy slides and one enlarged picture of an autopsy slide into evidence. The state offered the photographs of Wilson's body to illustrate the crime scene and to prove the required *mens rea.* The state used the slides to explain the coroner's medical and forensic testimony.

■ Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court.[15] While we may disagree with the trial court's finding that none of the photographs and slides was gruesome, that is not, standing alone, a basis for exclusion. The slides and photographs were relevant and of probative value in assisting the jury in understanding the manner and circumstances of Wilson's death. We thus find no abuse of discretion in the admission of this evidence.[16] Accordingly, the third assignment of error is overruled.

■ Reaves contends in his fourth assignment of error that the trial court erred in permitting the prosecution to exercise a peremptory challenge against an African–American juror in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

■ In order to state a prima facie case of purposeful discrimination under *Batson,* an accused must demonstrate (1) that members of a recognized racial group have been peremptorily challenged and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race.[17] If the accused makes a prima facie case of discrimination, the state must then come forward with a neutral explanation.[18] A trial court's finding of no discriminatory intent "will not be reversed on appeal absent a determination that it was clearly erroneous."[19]

Reaves is an African–American. During voir dire, the prosecution exercised a peremptory challenge to strike prospective juror Wells, an African–American,

---

15. *State v. Landrum* (1990), 53 Ohio St.3d 107, 559 N.E.2d 710.

16. *State v. Maurer* (1984) 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus.

17. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313; *State v. Hill* (1995), 73 Ohio St.3d 433, 444–445, 653 N.E.2d 271, 282.

18. *Id.* at 445, 653 N.E.2d at 282.

19. *Hernandez,* 63 Ohio St.3d at 583, 589 N.E.2d at 1314.

788

from the jury panel. At the time, two African–Americans besides Wells were part of the venire.

Wells was questioned on voir dire about the felony prosecution of her son by the Hamilton County Prosecutor's Office four years earlier. Wells indicated that, despite the prosecution, she could be impartial. The prosecutor passed for cause but used a peremptory challenge to dismiss Wells. Defense counsel raised a *Batson* challenge. The prosecutor stated on the record that the peremptory challenge was based upon the fact that Wells's son was prosecuted by his office for a felony offense within the past four years and that he was still incarcerated at the time of Reaves's trial. The trial court found this to be a facially valid race-neutral reason. The final make-up of the jury included one African–American male.

We are not persuaded that the trial court's conclusion was clearly erroneous. Accordingly, the assignment of error is overruled.

■ In his final assignment of error, Reaves argues that his conviction is not supported by sufficient, credible evidence. We disagree. We have exhaustively analyzed the two sets of stories told by Rodean Frazier in this case. It was the province of the jury to sort out which story it believed. The jury obviously believed Frazier's initial identification of Reaves as one of the perpetrators. There was sufficient, credible evidence to support this verdict. Accordingly, this assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

SUNDERMANN, P.J., concurs.

PAINTER, J., concurs in part and dissents in part.

PAINTER, Judge, concurring in part and dissenting in part.

I concur in everything except the resolution of the third assignment of error. The issue of how many pictures to admit is primarily an issue for the discretion of the trial court, but there must come a time when we say that the line has been crossed. Nine gruesome blowups of the bloody corpse and twenty-six autopsy slides are too much, especially when the major issue in the case is whether the defendant was involved in the crime at all. I would reverse and grant Reaves a new trial.