OPINION
Defendant-appellant, Casmiro Ellis, appeals from the judgment of the Mahoning County Court of Common Pleas finding him guilty of voluntary manslaughter with a firearm specification following a jury verdict.
On or about September 25, 1999, Karl Green (Green) went to the Mystic Lounge in Youngstown with a friend. They left the bar when it closed at approximately 2:15 a.m. The Mystic Lounge is located across the street from the parking lot of Mr. Paul's Bakery where many of the patrons of the bar park their cars and congregate after the Mystic Lounge closes. Upon walking through Mr. Paul's parking lot, Green became engaged in an argument with appellant. A shouting match ensued. Green was shot several times in the chest, back, thigh, and calf, which resulted in his death.
Appellant and co-defendant, Craig Stevens (Stevens), were subsequently tried to a jury for voluntary manslaughter and murder respectively. Appellant was convicted of voluntary manslaughter while Stevens was acquitted of murder. Appellant filed his notice of appeal on February 16, 2000.
Appellant asserts two assignments of error, the first of which states:
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY PERMITTING THE STATE OF OHIO TO EXERCISE PEREMPTORY CHALLENGES BASED ON RACE."
Appellant argues that plaintiff-appellee, the State of Ohio, excused two potential African-American jurors on the sole basis of race. He asserts that the trial court erred in not requiring appellant to provide a race-neutral explanation for excusing a potential African-American juror.
In Batson v. Kentucky (1986), 476 U.S. 79, 89, the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in exercising its peremptory challenges to exclude members of minority groups from service on petit juries.
To establish a claim of purposeful discrimination the defendant must demonstrate: (1) that the prosecution excluded members of a cognizable racial group; and (2) that the facts and circumstances raise an inference that the prosecutor exercised peremptory challenges to exclude potential jurors based on their race. State v. Hill (1995), 73 Ohio St.3d 433,444. If the defendant makes such a showing, the burden then shifts to the prosecution to provide a race-neutral explanation for excusing the challenged juror. Id.
An appellate court will not reverse the trial court's decision of no discrimination unless the finding is clearly erroneous. State v.Hernandez (1992), 63 Ohio St.3d 577, 583.
Appellant challenges the exclusion of two potential African-American jurors, Juror Atkinson and Juror Carter. However, the trial court excused the first African-American juror, Juror Atkinson, for cause. Juror Atkinson stated that the aunt of one of the defendants was a friend of his. Juror Atkinson also indicated that the defendant's aunt's husband, who was a potential witness in the case, was also a friend of his. He stated that he felt his friendship with these individuals would prohibit him from serving on the case. The court then excused Juror Atkinson for cause without objection from appellant. The record supports the trial court's excusal of Juror Atkinson.
Appellant also asserts that appellee used a peremptory challenge to exclude Juror Carter based on his race. Appellee did exercise a peremptory challenge to excuse Juror Carter. The trial court did not require appellee to give a race-neutral explanation for excusing Juror Carter. The court stated that appellant must show a pattern of discrimination before raising a Batson challenge.
The existence of a pattern of discriminatory strikes is not a prerequisite to prevailing on a Batson challenge. State v. White (1999),85 Ohio St.3d 433, 436. "Such a rule would license prosecutors to exercise one illegal peremptory strike per trial. The law of equal protection does not allow `one free bite.'" Id.
Although the trial court did not require appellee to give a race-neutral explanation for excusing Juror Carter, the court told appellee it could give its explanation for the record if it chose to do so. Appellee chose to provide its reasons for excusing Juror Carter. Appellee stated on the record:
 "I understand, and I appreciate that, Judge. But truly, my excusal of Juror No. 12 [Juror Carter] has absolutely nothing to do with his race. It has to do with two reasons, one of which is, he has a nephew who is in prison, who has been convicted of murder, who, when I asked him a couple of questions about that, he talks to him on the phone. I'm concerned he may have some sympathy towards these defendants. And also, he made a comment that if he did it, he belongs there. His nephew was convicted. Obviously, he did it. And if this guy is part of our jury panel, I got the impression from him, based upon his comments as to what happened in his nephew's case since he was convicted by a jury trial.
 "Additionally, the other reason that I have is there was a dialogue that Attorney Macejko had with him about the defendant's testimony, and would the defendant's testimony be considered by the jury as anybody elses [sic.] testimony, regardless of whether or not it's the defendant who is testifying.
 "The comments that he made demonstrated, in my opinion, for lack of a better term, an attitude to jurors prior to him being questioned said that they would treat the testimony like any other witness. His comment lead me to believe he doesn't think that that is true. That, in his opinion, the defendant's testimony is not treated the same as any other witnesses, contrary to what the two jurors before him had just said. So for those reasons, I think that he would be prejudiced against the State of Ohio, and that's why I moved to exercise my peremptory challenge." (Tr. 247-49).
Although the trial court erred in ruling that appellee was not required to provide a race-neutral explanation, appellee provided its explanation regardless. The record supports appellee's basis for excluding Juror Carter. Juror Carter stated that his nephew was in prison for murder and that he communicated with him by telephone. It was reasonable for appellee to think that Juror Carter might be more sympathetic towards appellant and his co-defendant, who were charged with voluntary manslaughter and murder respectively. Furthermore, Juror Carter stated that he was skeptical about the defendant's fair treatment at trial based on his life experiences. Appellee had a reasonable belief that Juror Carter would not treat the defendants' testimony the same as other witnesses and that this would prejudice its case.
It is apparent from appellee's explanation that it had a race-neutral reason for excusing Juror Carter. Accordingly, appellant's first assignment of error is without merit.
Appellant's second assignment of error states:
 "THE APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
Appellant argues that his conviction was against the manifest weight of the evidence. He asserts that he proved that he acted in self-defense when he shot Green. Appellant testified that Green threatened to kill him. Officer Joseph Wess (Officer Wess) also testified that appellant told him that Green threatened appellant's life. Appellant also points to the testimony of Darrell Clark (Clark). Clark testified that Green was aggressive and wanted to fight appellant. Clark also testified that appellant was acting scared.
Appellant further testified that he suffered a gunshot wound to his foot. Appellant claims that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of deadly force.
In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasissic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Appellant was convicted of voluntary manslaughter in violation of R.C.2903.03(A)(B), with a firearm specification in violation of R.C.2941.145(A). R.C. 2903.03 provides:
 "(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
 "(B) Whoever violates this section is guilty of voluntary manslaughter, a felony of the first degree."
At trial, appellant claimed he shot Green in self-defense. To prove a claim of self-defense, the defendant must prove: (1) "the slayer was not at fault in creating the situation giving rise to the affray;" (2) "the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force;" and (3) "the slayer must not have violated any duty to retreat or avoid the danger." State v. Melchior (1978),56 Ohio St.2d 15, 20-21.
A review of the record reveals the following testimony.
Clark, Davis, and Jason Poole (Poole) all testified that appellant shot Green. Clark, Davis, and Karim Beacham (Beacham) testified that Green was in the Mystic Lounge before the shooting. Clark and Beacham also testified that before patrons are permitted to enter the Mystic Lounge, they are patted down to ensure that they are unarmed. Clark testified that Green did not have a weapon on his person when he confronted appellant.
Clark and Alynn Grant (Grant) testified that shortly after the Mystic Lounge closed and appellant arrived at Mr. Paul's parking lot, Green approached appellant and the two began to argue. Clark and Davis testified that Green was confrontational and that appellant backed away from him. However, Clark and Davis also testified that Green never touched appellant nor did Green attempt to strike appellant.
There is conflicting testimony as to what happened next. Clark, Davis, and Jason Poole (Poole) testified that appellant pulled out his gun and began to shoot Green. Clark and Poole also testified that appellant continued to shoot Green after Green had fallen to the ground. However, Grant and appellant testified that Green shot appellant first and then appellant shot Green.
Additional shooting broke out in the parking lot. Appellant was shot in the foot. After the shooting, appellant went to the hospital to seek treatment for the gunshot wound to his foot. Officer Wess went to the hospital and spoke with appellant. Officer Wess testified that appellant told him that he did not know who shot him in the foot. Officer Wess also testified that appellant did tell him that Green threatened to kill him.
Appellant testified that he had a .45 caliber gun with him in Mr. Paul's parking lot. He further testified that when he saw Green for the first time that night Green was "right in [his] face." Appellant testified that he was afraid of Green and that Green threatened his life. He testified that during the argument, Green reached for his gun. Appellant stated that he then began to reach for his own gun and then he heard a shot. He testified that he began to run and was shooting at the same time. Appellant stated that he was shooting in an upward direction.
Green suffered gunshot wounds to the chest, back, thigh, and calf, which resulted in his death. Dr. Jesse Giles (Dr. Giles), the forensic pathologist who performed Green's autopsy, testified that the shots to Green's chest and back were fired at close range. Dr. Giles also testified that the shot to Green's chest traveled in a downward motion through Green's body.
Officer Lou Ciavarella testified that he found eight .45 caliber spent shell casings at the scene in addition to several other types of casings nearby. Michael Roberts (Roberts), a forensic scientist at the Bureau of Criminal Identification and Investigation, testified that all eight of the .45 caliber casings were fired from the same weapon. Roberts further testified that the bullets removed from Green's body matched the casings found at the scene as being fired from the same weapon.
Although there are some conflicts in the testimony, appellee presented plenty of evidence on which the jury could conclude that appellant shot Green and that appellant was not acting in self-defense. Although Green may have started the argument with appellant, this fact alone does not compel the jury to find that appellant acted in self-defense. Several witnesses testified that they saw appellant shoot Green. Witnesses also testified that Green was unarmed. Witnesses testified that appellant shot Green after Green had fallen to the ground. Also, the forensic scientist's and forensic pathologist's testimony are inconsistent with appellant's claim of self-defense. Appellant testified that he was running and shooting in an upward direction, however, Green's autopsy revealed that he was shot at close range and that the bullet in his chest traveled in a downward direction.
Based on the evidence presented, the jury did not lose its way in resolving the evidence. It was for the jury to determine the witnesses' credibility and the weight of the evidence. The jurors were able to observe the witnesses' and appellant's demeanor as they testified. Whether or not appellant acted in self-defense was a question of fact best left to the jury's determination. Appellee presented ample, credible evidence to support the jury's finding of guilt.
Accordingly, appellant's second assignment of error is without merit.
For the reasons stated above, the decision of the trial court is hereby affirmed.
Waite, J., concurs
DeGenaro, J., concurs