[Cite as *State v. Godfrey*, 2014-Ohio-5392.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
WYANDOT COUNTY


STATE OF OHIO,

    PLAINTIFF-APPELLEE,              CASE NO. 16-14-03

    v.

YUL T. GODFREY,
                               O P I N I O N
    DEFENDANT-APPELLANT.


Appeal from Upper Sandusky Municipal Court
Trial Court No. CRB 10-00454 B

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: December 8, 2014


APPEARANCES:

    *Jerome Phillips* for Appellant

    *Richard A. Grafmiller* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant Yul T. Godfrey ("Godfrey") appeals the March 11, 2014, judgment of the Upper Sandusky Municipal Court finding Godfrey guilty of Vehicular Manslaughter in violation of R.C. 2903.06, a second degree misdemeanor, and sentencing Godfrey to pay a fine and serve 90 days in jail with all 90 days suspended.

{¶2} The facts relevant to this appeal are as follows. On November 19, 2010, Godfrey was turning his semi-truck and trailer left onto State Route 15, a four lane divided highway. A 2004 Chevrolet Tahoe driven by Juliana Karmann ("Karmann") was traveling northwest on State Route 15 at that time. While traveling through the crossover to make his left turn onto State Route 15, Godfrey's trailer did not fully clear the lane Karmann was driving in and Karmann's vehicle struck Godfrey's trailer behind the rear wheels. Karmann's vehicle then traveled through the median and struck another vehicle and some trees before stopping. As a result of the accident, Karmann was killed and her three passengers were injured.

{¶3} On November 22, 2010, Godfrey was charged with Vehicular Homicide, a first degree misdemeanor in violation of R.C. 2903.06, Vehicular Manslaughter, a second degree misdemeanor in violation of R.C. 2903.06, and

Failure to Yield, a minor misdemeanor in violation of R.C. 4511.43. Godfrey entered pleas of not guilty to all charges.

{¶4} On January 5, 2012, a bench trial was held before the Upper Sandusky Municipal Court. At trial the State presented the testimony of the coroner, witnesses to various parts of the accident, and the investigating officer. Godfrey then presented the testimony of multiple experts, specifically accident reconstructionists, challenging whether Karmann's vehicle was in the lawful use of the roadway at the time of the accident.

{¶5} Ultimately, after the parties presented their evidence, Godfrey was acquitted of the Vehicular Homicide charge; however, he was found guilty of the remaining two charges, Failure to Yield and Vehicular Manslaughter. Sentencing was set for a later date.

{¶6} On January 18, 2012, Godfrey filed a motion for a new trial. A hearing was held on the motion on March 26, 2012, and the trial court ultimately overruled the motion.

{¶7} On May 2, 2012, the trial court sentenced Godfrey to ninety days in jail, with all 90 days suspended, a $750 fine, and court costs of $219 for the Vehicular Manslaughter and a $75 fine and court costs of $551.97 for the conviction on the Failure to Yield charge.

{¶8} Godfrey subsequently appealed his convictions to this court arguing, *inter alia*, that the trial court erred by not applying the correct legal standard to determine if Karmann's vehicle was traveling at a reasonable rate of speed, and that the trial court erred by allowing private attorneys to participate on behalf of the prosecution during criminal proceedings. *See State v. Godfrey*, 3d Dist. Wyandot Nos. 16-12-06, 16-12-07, 2013-Ohio-3396. A majority opinion from this court reversed and remanded Godfrey's convictions, holding that the trial court had to separately determine "whether Karmann was operating her vehicle in a lawful manner so that she maintained the right of way at the time of the accident" and then make a separate and specific finding on this issue.[1] *Godfrey* at ¶ 11 (Shaw, J. dissenting).

{¶9} On January 9, 2014, following this Court's remand, the trial court issued a journal entry entering findings of fact and conclusions of law in accordance with the direction of this Court. (Doc. No. 41). In that entry, the trial court analyzed the testimony related to decedent Karmann's speed, weighed the credibility of the evidence and determined beyond a reasonable doubt that she was "operating her vehicle at a speed within the average range [of] accepted travel on a divided four lane highway." (*Id.*) The Court thus found "beyond a reasonable doubt that [Godfrey] failed to yield to oncoming traffic of Decedent in violation of

---

[1] The majority also found error in allowing the participation of a civil attorney in the criminal proceedings. The remaining three assignments of error were found to be moot.

ORC 4511.43A * * * resulting in the death of * * * Karman in violation of ORC 2903.06 Vehicular Manslaughter." (*Id.*)

{¶10} On January 24, 2014, Godfrey filed a "Motion for Reconsideration" arguing that the trial court's entry "was made without providing the defendant with an opportunity to be heard or present evidence on the issue." (Doc. No. 42).

{¶11} On January 24, 2014, the trial court denied Godfrey's "Motion for Reconsideration" stating that "extensive evidence was heard during the defendant's trial," and "[f]urther, the Court heard additional arguments on defendant's request for new trial March 26, 2012." (Doc. No. 43).

{¶12} After the court denied his Motion for Reconsideration, Godfrey appealed the judgment against him to this Court. On March 4, 2014, this Court dismissed Godfrey's appeal as the trial court's January 9, 2014 entry did not contain both a finding of guilt and a sentence, rendering the entry not a final appealable order.

{¶13} On March 11, 2014, the trial court filed a judgment entry finding that Godfrey Failed to Yield to Oncoming Traffic in violation of R.C. 4511.43(A), resulting in the death of Karmann in violation of R.C. 2903.06, Vehicular Manslaughter. (Doc. 48). The trial court's entry also reimposed its previously ordered sentence from May 12, 2012. (*Id.*)

{¶14} It is from this judgment that Godfrey appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL.**

**ASSIGNMENT OF ERROR 2**
**APPELLANT'S CONVICTION WAS BASED UPON INSUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR 3**
**THE TRIAL COURT ERRED BY NOT HOLDING AN EVIDENTIARY HEARING AS IT IGNORED STIPULATED EVIDENCE IN MAKING ITS FINDINGS OF FACTS UPON REMAND.**

{¶15} For the sake of clarity, we elect to address the assignments of error out of the order in which they were raised.

*Second Assignment of Error*

{¶16} In his second assignment of error, Godfrey contends that there was insufficient evidence to convict him, and that his convictions were against the manifest weight of the evidence. Specifically, Godfrey argues that the Electronic Data Recorder, or "black box," indicated Karmann was traveling at 95 mph five seconds prior to the accident, that this speed was unreasonable, and that Karmann therefore was not in lawful use of the roadway and lost her right-of-way.

{¶17} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47, citing *State v. Jenks,* 61 Ohio St.3d 259 (1991), superseded by state constitutional amendment on other grounds as stated in *State v. Smith,* 80 Ohio St.3d 89 (1997). Sufficiency is a test of adequacy, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

{¶18} The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶19} Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Volkman, supra,* at ¶ 12; *Thompkins*, *supra*, at 387. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the

evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387.

{¶20} In this case, Godfrey was convicted of Failure to Yield in violation of R.C. 4511.44(A), which reads

> **(A) The operator of a vehicle \* \* \* about to enter or cross a highway from any place other than another roadway shall yield the right of way to all traffic approaching on the roadway to be entered or crossed.**

Godfrey was also convicted of Vehicular Manslaughter in violation of R.C. 2903.06(A)(4), which reads

> **(A)   No person, while operating \* \* \* a motor vehicle \* \* \* shall cause the death of another \* \* \* in any of the following ways:**
>
> **\* \* \***
>
> **(4)   As the proximate result of committing a violation of any provision of any section contained in Title XLV of the Revised Code that is a minor misdemeanor \* \* \* [.]**

{¶21} In order to prove that Godfrey committed the charged offenses, the State called four witnesses at trial. The first witness the State called was Dr. Joseph Sberna. Dr. Sberna testified that he was called to the scene of the accident and determined that the victim, Karmann, had died of blunt force trauma from a vehicular accident. (Tr. at 16).

{¶22} The State next called Larry Neuenschwander who testified that at the time of the accident he was driving with his wife toward Columbus (the opposite direction of Karmann) in the right-most lane when he saw an SUV coming at him from across the grassy area separating the four lane highway. Neuenschwander testified that he saw something protruding from the SUV, and tried to swerve to his right to avoid it, but his vehicle was struck. (Tr. at 28-29). Neuenschwander testified that after his vehicle was struck, he got out of his vehicle and talked to one of the girls that had been in the SUV, who informed Neuenschwander that the driver of the SUV was not responding. (Tr. at 30). Neuenschwander testified that he then had his wife call 9-1-1. (*Id.*)

{¶23} The State next called Bennett Clark Osantowski who was a student at Denison University along with Karmann. Osantowski testified that Karmann was driving him and two other classmates, Ashley Maiorana and Maddie Sanders, back home for Thanksgiving break. (Tr. at 33). Osantowski testified that Karmann was driving and he was behind her in the backseat, that Ashley was in the front seat and Maddie was behind her, to Osantowski's right. (*Id.*) Osantowski testified that he was familiar with Karmann's SUV because he drove one himself and his parents had owned one all his life. (Tr. at 33-34). Osantowski also testified that he had made the trip with Karman two or three times previously and that on their previous trips he had no concern with her driving or speeding. (Tr. at 39-41).

{¶24} Osantowski testified that about ten minutes before the accident he had started to watch a movie on his laptop. (Tr. at 34). Osantowski testified that he remembered the girls screaming, and he looked up and saw the trailer of a semi-truck in front of them. (*Id*.) Osantowski testified that they were in the left lane of travel at the time. (*Id*. at 35). Osantowski testified that they had been in the left lane for a while and that the roads were "quite empty." (*Id*.) Osantowski testified that after he saw the truck trailer, he believed he was knocked out, and he did not remember anything for about 15 or 20 minutes. (Tr. at 35-36).

{¶25} As to Karmann's speed, Osantowski testified that "nothing seemed unusual. I think I would have recognized if we were speeding. And everything felt normal." (Tr. at 36). When asked to clarify as to why he would have recognized a change in Karmann's speed Osantowski testified: "Because I have been in a bigger truck and I know what the speed feels like, and I know what the speed feels like, and I know if we were going in excess of 80 or 90 miles an hour." (Tr. at 36).

{¶26} Osantowski did testify, however, that he never looked at the speedometer. (*Id*.) He testified he didn't remember hearing brakes but he did remember swerving to the right when he saw the semi-truck. (Tr .at 38). He testified that he did not notice them passing any other vehicles on the highway prior to the accident. (*Id*.)

{¶27} The State next called Trooper Gary L. Griffeth of the State Highway Patrol. Trooper Griffeth testified that he was called to the scene of the accident and investigated the crash scene. (Tr. at 48). Trooper Griffeth testified to interviewing multiple witnesses and to compiling a report containing the witnesses' statements, which was stipulated by the parties as admissible. Trooper Griffith testified that he interviewed Karmann's passenger Madison Sanders by phone. Madison Sanders indicated that Karmann's vehicle was traveling at "highways speeds it didn't seem too slow or too fast." (Tr. at 58); (State's Ex. E). Sanders also told Trooper Griffeth that she saw the semi as it was crossing in front of them to make its left turn. (*Id*.); (*Id*.). Sanders stated that the semi "sped up in a hurry to get across when we hit him." (*Id*. at 59) (*Id*.). Sanders also stated that they had not stopped anywhere as they were traveling. (*Id*.); (*Id*.).

{¶28} Trooper Griffeth testified that he also obtained the statement of Kyle Loomis who was driving westbound on State Route 15 in the same direction as Karmann's vehicle. Loomis wrote a statement stating in part that he was traveling about 66 mph roughly a quarter of a mile away when he first saw the semi, and that it was "moving into the crossover" when he saw the semi "bounce" indicative of the collision. (Tr. at 60-61); (State's Ex. E). Loomis stated that prior to the collision he was not passed by any vehicles going at a high rate of speed. (Tr. at

61); (*Id*.). Loomis stated that he was driving in the left lane, similar to Karmann, and that no one passed him even on the right side. (Tr. at 62); (*Id*.).

{¶29} Trooper Griffeth testified that he checked MapQuest to determine "the movement of [Karmann's] vehicle from * * * Denison University to [the location of the crash]." (Tr. at 70-71). Trooper Griffeth testified that he used MapQuest and determined that based on the phone call Karmann made to her parents when she left Denison, "the crash took place exactly when it should have," indicating that Karmann had perhaps not been speeding as indicated by the EDR. (Tr. at 71).

{¶30} In addition, Trooper Griffeth testified that the "crossover" Godfrey was using to turn left onto State Route 15 was 50 feet at its widest, and that Godfrey's vehicle was between 61 to 65 feet in length from front bumper to rear door. (Tr. at 65). Trooper Griffeth testified that ultimately Godfrey "failed to yield the right-of-way, entering roadway without sufficient time to complete the maneuver without causing another vehicle to slow, stop, or otherwise adjust its speed to avoid [Godfrey]'s actions crossing the westbound lanes of State Route 15." (Tr .at 72).

{¶31} On cross-examination Trooper Griffeth testified that Godfrey was charged the night of the accident, before Trooper Griffeth had done all of his tests and before he had the results of the "black box" for Karmann's SUV. (Tr. at 75-

-12-

76). Trooper Griffeth testified that Sergeant Kinn downloaded the "black box" information and that according to the black box Karmann was traveling 95 mph five seconds prior to impact. (Tr. at 78-79). Trooper Griffeth testified that the speed limit on State Route 15 was 65 mph and that 95 mph would not be a reasonable speed at night at that intersection. (Tr. at 79). Trooper Griffeth further testified that he would have cited Karmann for speeding if he had clocked her driving 95 mph, but that he would not have charged her for reckless operation. (Tr. at 79).

{¶32} Trooper Griffeth testified that when he had the "black box" data he reconsidered filing charges against Godfrey, and that he would not have filed them the night of the incident if he had all of the information. (Tr. at 88). However, Trooper Griffeth testified on re-direct that he ultimately still would have filed charges against Godfrey for Failure to Yield even after having the black box data. (Tr. at 113-114). Trooper Griffeth testified that it was Godfrey's burden to yield, that it was his responsibility to decide when to move, and to decide the speed of the Karmann vehicle before attempting to turn left. (Tr. at 112). Trooper Griffeth testified that Godfrey did not consider all of those things. (Tr. at 113).

{¶33} After Trooper Griffeth completed his testimony, the State rested its case and Godfrey made a Criminal Rule 29 motion for acquittal. The trial court overruled this motion.

-13-

{¶34} Godfrey then presented his case-in-chief, first calling Richard Ruth, an engineer/accident reconstructionist who specialized in Event Data Recorders or the "black box." Ruth testified that

> **[t]he event data recorder is part of the airbag control module typically and in this vehicle, it is. The idea is that if there is a severe accident that someone may want to understand how did that accident occur. [sic] * * * It * * * has a small memory chip. Within that memory, it writes down before a crash happens. It writes down how fast you were going, whether you're on the accelerator pedal or the brake, and the RPM's of the engine for five seconds at one-second intervals prior to the crash.**

(Tr. at 125-26).

{¶35} Ruth testified that Sergeant Christopher Kinn read the data and that Ruth obtained a copy of Sergeant Kinn's report. Ruth testified that five seconds prior to impact the EDR indicated Karmann's vehicle was traveling at 95 mph, at four seconds still 95 mph, at three seconds the brake had been applied and the vehicle was traveling 83 mph, at two seconds 83 mph, and at the second prior to impact Karmann's vehicle was traveling 66 mph. (Tr. at 127-128). Ruth testified that in his opinion if Karmann had been traveling 65 mph she would have been able to avoid the collision. (Tr. at 131).

{¶36} Ruth also testified that the EDR recorded two events, "one when the airbag deployed and another one about a second later. It reported a second time, presumably we don't know exactly what triggered that second event * * *. We

ended up getting two sets of data which overlap. And basically other than the fact they were one second apart, they agreed and supposed [sic] one another? [sic]" (Tr. at 133-134).

**{¶37}** On cross-examination Ruth testified that in his opinion, if Godfrey had started sooner his truck may have been clear of the roadway and the collision may not have occurred. (Tr. at 136).

**{¶38}** Godfrey next called Sergeant Kinn to testify. Sergeant Kinn testified that he was called to the scene of the accident as an accident reconstructionist and that he took measurements at the scene. (Tr. at 150). Sergeant Kinn testified that he downloaded the information contained in the black box a few days after the incident. (Tr. at 151). Sergeant Kinn testified that the black box "showed the speed to be 95 miles per hour on the Tahoe" and that he considered that speed excessive and unreasonable under the conditions. (Tr. at 151-152). Sergeant Kinn also testified he would have not filed charges against Godfrey, that instead he would have referred the incident to the prosecutor's office. (Tr. at 156). On cross-examination, Sergeant Kinn clarified, stating "in situations that aren't clear-cut, we rely on the guidance of the local prosecutor to determine if charges would be filed or not." (*Id.*)

**{¶39}** Further on cross-examination, Sergeant Kinn testified that very few people go 65 mph on the highway. (Tr. at 161). He also testified that the average

vehicle's speed in a 65 mph zone is between 70 and 75 mph. (*Id*.). In addition, Sergeant Kinn testified that due to the size of the semi-truck and trailer Godfrey could not get into the paved crossover without blocking some of the traffic on the roadway. (Tr. at 169).

{¶40} Godfrey next called Fredrick Greive, a traffic reconstructionist and former member of the highway patrol. Greive testified that he considered the crash report generated by the highway patrol, the accident reports, and the EDR download and concluded that the speed of Karmann's vehicle caused the accident. (Tr. at 176).

{¶41} On cross-examination Greive testified that at the time of the accident the rear portion of Godfrey's trailer was "in the vicinity of the center line, maybe slightly across the center line" of the side of the divided highway Karmann was driving on. (Tr. at 184). Greive also testified that both Godfrey and Karmann had a responsibility to make sure there was no accident in that Godfrey had to "make sure he can clear the intersection" and Karmann had to "be driving within the speed limit." (Tr. at 189)

{¶42} Godfrey took the stand himself as the last witness at trial. Godfrey testified that he looked both ways and saw a vehicle "way down the street" and decided "[t]here's enough time to make it across." (Tr. at 194). Godfrey testified that he "looked to [his] left twice" before he proceeded to cross, and on the second

look he still thought he had enough time to make it. (Tr. at 203). He testified that once he started moving he never stopped his vehicle as he was moving across the lanes of traffic, but that he was possibly blocking the northbound lanes of State Route 15 at the time of the collision. (Tr. at 196).

{¶43} After Godfrey testified he rested his case. Godfrey then renewed his Criminal Rule 29 motion for acquittal and that motion was denied. The parties then gave closing arguments. Following closing arguments, the court conducted the following analysis:

> **[W]here I see some fault here, the accident on the other side of the road with the van that got clipped by the victim's vehicle or parts thereof, immediately happened, and it happened within a split second when she careened across the median and hit the van. That, plus the one statement in the report, is that the defendant clearly misjudged the fact he could clear the northbound lane and safely get on the southbound lane. He was seen by the motorists substantially a quarter-of-a-mile or so behind the victim's car, saw the truck and saw it bounce. So what he saw of the truck was when it was still in the roadway. And even in the reconstructionist's testimony indicates that the back of the trailer was still in the driving northbound lane in part. * * ***
>
> **You got hung up, couldn't finish making your turn. * * * I understand the difficulty of an 18-wheeler when you have to wait, and wait, and wait for both lanes. * * ***
>
> **So it is the opinion of the Court that you did fail to yield the right-of-way and I so will find you guilty. It is also the opinion of this Court based on the testimony and evidence that you are guilty of vehicular manslaughter and I will so find.**

(Tr. at 222-223).

**{¶44}** As noted earlier, this Court subsequently held that these findings were incomplete, and that the trial court was required to separately determine whether Karmann was operating her vehicle in a lawful manner so that she maintained the right of way at the time of the accident. On remand the trial court then issued new findings of fact, reasoning as follows with regard to Karmann's speed.

> **Exhibit 2 was presented and prepared by Richard Ruth and stated his method of evaluation as to whether the ED[R] was in proper working order. This was accomplished primarily by checking if any vehicle modification such as tires, equipment modifications were made to the vehicle and using published test data. The decedent's vehicle was a 2004 Chevy Tahoe. It is noteworthy that during Ruth's in court testimony the EDR recorded two events at the time of the crash; (1) when the air bag in the Tahoe deployed and (2) another one second later for which he did not have an explanation for. It is further noteworthy that given the electronic and mechanical design of the EDR there is no way to periodically verify its accuracy as there is with alcohol breath testing devices, radar and laser speed measuring devices. Defendant's expert testimony and exhibits as well as Frederick Greives accident reconstruction report, places most of their opinions on the EDR speed readings. Sgt. Kinn's testimony again trusted the EDR. Courts regularly require calibration checks of radar, laser, BAC verification be accomplished regularly and are required before being acceptable as evidence. This Court is not convinced that the decedent was traveling at the speed so indicated as there is evidence indicating otherwise.**
>
> **Trooper Griffeth interviewed Kyle Loomis * * * [who] was traveling at 66 m.p.h. behind the decedent's vehicle. Mr. Loomis**

**had been traveling the same route as decedent from Delaware, Ohio along State Route 23 to US Route 15 where the accident happened without any stops en route. The decedent's vehicle had not passed Mr. Loomis.**

**Tpr. Gary Griffeth used map quest to verify travel time using the time of occupants phone call to a parent when leaving Dennison [sic] University to the location and time of the accident. The trooper indicated decedent was traveling at normal traffic speed according to map quest.**

**Catherine Maiorana was a front seat passenger in decedent's vehicle. She stated that while she did not see the speedometer, she believed the decedent was traveling 65-70 m.p.h. * * * She further testified that it was the decedent's habit to drive in the left lane on 4 lane roads. Sgt. Kinn stated that at impact, the defendant's trailer completely blocked the left northbound lane and may have blocked part of the right northbound lane as being slightly to the right of the lane center line.**

**\* \* \* This Court finds beyond a reasonable doubt that Decedent [Karmann] was operating her vehicle at a speed within the average range accepted travel on a divided four lane roadway.**

(Doc. 41). The court thus found Godfrey guilty of Failure to Yield and Vehicular Manslaughter.

{¶45} On appeal, Godfrey challenges the trial court's finding regarding Karmann's speed. Godfrey argues that the EDR/black box conclusively established Karmann was going 95 mph five seconds prior to the accident and that such speed was unreasonable. Although Godfrey first argues that there was insufficient evidence to convict him, his argument seems to be focused more on the trial court's decision being against the weight of the evidence, as there was

-19-

clearly testimony and information contained in the exhibits indicating that Karmann's vehicle was not traveling 95 mph as indicated by the EDR. There was also certainly testimony that Godfrey did not clear the roadway in time, that his semi-truck trailer partially blocked Karmann's lane of travel at the time of the accident, and that he sped up at the last second. Godfrey's own expert testified that Godfrey had a duty to make sure he could clear the space in time. Therefore, Godfrey's argument that there was insufficient evidence to convict him is not well-taken.

{¶46} Turning to Godfrey's argument that his convictions were against the weight of the evidence, Godfrey relies on the EDR indicating Karmann's speed to be 95 mph.[2] The trial court specifically addressed the testimony countering the EDR's reading, *and* specifically addressed the reasons the trial court decided not to rely on the EDR. The testimony highlighted by the trial court was contained in the record and did indicate that the EDR could possibly have been incorrect. The statement of Kyle Loomis is particularly telling given that he was merely a bystander driving behind Karmann's vehicle. Loomis indicated he had been

---

[2] Godfrey argues in another assignment of error that the State had actually stipulated to Karmann's vehicle traveling 95 mph. However, despite Godfrey's contention, there is no indication that the State ever stipulated to this as a fact rather than merely stipulating to the admissibility of the documents containing the findings proposed as facts by Godfrey. In fact, the majority of the testimony the State presented challenged whether Karmann was driving 95 mph, clearly indicating a lack of agreement on this point. Moreover, if we were to accept Godfrey's contention that the parties stipulated to the truth of all the statements contained in the stipulated reports, there would be conflicting "truths" as to the speed of Karmann's vehicle.

driving in the left lane prior to the accident and had not been passed anytime recently on the left or the right. Loomis indicated he was only driving about 66 mph. Moreover, there was no basis in the record for giving conclusive weight to the defense experts' interpretations in that we note none of those experts independently examined the EDR itself but rather merely relied upon the Ohio State Highway Patrol's download of the EDR's data.

**{¶47}** When considering all of the testimony in the record, and the specific testimony cited by the trial court after remand, we cannot find that the trial court, acting as factfinder, clearly lost its way or created a manifest miscarriage of justice. Accordingly, we cannot find that there was insufficient evidence to convict Godfrey of Failure to Yield or Vehicular Manslaughter or that his convictions were against the manifest weight of the evidence. Therefore, Godfrey's second assignment of error is overruled.

*Third Assignment of Error*

**{¶48}** In Godfrey's third assignment of error, he contends that the trial court erred by not holding a hearing upon remand from this Court before entering its findings of fact and conclusions of law. Specifically, Godfrey contends that the trial court should have held a hearing before "disregarding the stipulated evidence."

**{¶49}** In the original appeal, this Court specifically remanded the case for the trial court to weigh the evidence already presented at trial and make a factual determination. This is precisely what the trial court did. No further hearing was necessary based on this Court's specific instructions on remand. Accordingly, we cannot find that the trial court erred by not holding a hearing before making the finding it was directed to make by this court.

**{¶50}** Therefore, Godfrey's third assignment of error is overruled.

*First Assignment of Error*

**{¶51}** In Godfrey's first assignment of error, he argues that the trial court erred by not granting Godfrey's motion for a new trial that had been made after his trial was originally completed but prior to his original appeal.

**{¶52}** Based on the original appeal, this Court reversed and remanded the trial court's decision, determining that the trial court had not made a required finding regarding Karmann's speed. We thus held that Godfrey's trial was not complete until the finding was made. Therefore, any motion for a new trial that Godfrey had made after the original trial—prior to the original appeal—would have had to have been refiled after the trial was rendered complete. Godfrey did not file a second motion for a new trial following the trial court entering its final judgment in this case. Accordingly, Godfrey's argument pertaining to an earlier,

irrelevant new trial motion is not well-taken and his first assignment of error is overruled.

**{¶53}** However, we would note that with respect to Godfrey's sentence, it does not appear that the trial court held a new sentencing hearing after Godfrey was found guilty upon remand. From the trial court's final judgment entry, it appears the court simply reimposed its earlier sentence without holding a hearing.

**{¶54}** A defendant has a fundamental right to be present at all critical stages of his criminal trial. *State v. Salyers*, 5th Dist. Ashland No. 04COA60, 2005-Ohio-972, ¶ 8, citing *State v. Hill,* 73 Ohio St.3d 433, 444, 1995-Ohio-287, citing, Crim.R. 43(A) and Section 10, Article I, Ohio Constitution. The United States Supreme Court has stated that an accused is guaranteed the right to be present at all stages of criminal proceedings that are critical to its outcome when his or her absence may frustrate the fairness of the proceedings. *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).

**{¶55}** Pursuant to Criminal Rule 43(A), Godfrey could waive his presence at sentencing in a misdemeanor case, but there is no indication in the record before us that he did actually waive his presence at the sentencing hearing. Therefore, according to the record before us, we find that sentencing Godfrey in absentia upon remand was improper.

{¶56} Accordingly, Godfrey's first, second, and third assignments of error are overruled and the judgment of the trial court is affirmed on these issues; however, the sentence is reversed and the case is remanded for the limited purpose of resentencing Godfrey.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI, P.J., concurs in Judgment Only.**

**/jlr**

**ROGERS, J. Dissenting.**

{¶57} I must respectfully dissent from the opinion of the majority, and would find that the decision of the trial court is not supported by sufficient evidence and, in the alternative, is against the manifest weight of the evidence. I will discuss each in turn.

*Sufficiency of the Evidence*

{¶58} "It is axiomatic that the State has the burden to prove every element of an offense beyond a reasonable doubt." *State v. Jones*, 91 Ohio St.3d 335, 347 (2001). This burden cannot be shifted to the defendant. *State v. Sparks*, 3d Dist. Union No. 14-01-03, 2001 WL 929374, *3 (Aug. 16, 2001). For failure to yield,

the State must prove, as an element of the offense, that the victim's car had the right of way. *State v. Brooks*, 4th Dist. Meigs No. 359, 1985 WL 8313, *4 (Aug. 27, 1985); *see also Beers v. Wills*, 172 Ohio St. 569 (1962), paragraph two of the syllabus. "The law gives to the operator of the vehicle upon the highway a shield, an absolute right to proceed uninterruptedly. He forfeits the shield if he fails to proceed in a lawful manner." *Beers* at 571. Where evidence is presented that the victim's vehicle was traveling at speeds above the posted limit, it creates a presumption that it was proceeding in an unlawful manner, which can be rebutted by evidence showing that the speed was reasonable for the conditions. *State v. Legg*, 5th Dist. Licking No. 04 CA 63, 2005-Ohio-2376, ¶ 15.

{¶59} At trial, Godfrey presented ample evidence creating the presumption that Karmann was traveling above the posted limit. As this court previously noted: "Given all the testimony presented to the trial court, the issue of Karmann's speed was clearly raised by Godfrey at trial. Thus, the trial court had an obligation to determine whether Karmann was traveling at a reasonable speed for the conditions." *State v. Godfrey*, 3d Dist. Wyandot Nos. 16-12-06, 16-12-07, 2013-Ohio-3396, ¶ 11 ( hereinafter, "*Godfrey I*"). In its ruling on remand, the trial court found that a speed between 70 and 75 miles per hour would be reasonable for the conditions as per Sergeant Kinn's testimony. Therefore, for Godfrey to be found guilty, there must be sufficient evidence that Karmann's speed was within that

-25-

range. None of the witnesses provided evidence that Karmann's speed was within this range.

**{¶60}** While Kyle Loomis stated that he was traveling at 66 miles per hour at the time of the accident, he never gave any indication of Karmann's speed in relationship to his own. *See State v. Jarosz*, 11th Dist. Portage No. 2013-P-0050, 2013-Ohio-5839, ¶ 19 (officer could not establish speed of motorist when he could not establish he kept an even pace with vehicle). Without this information, the testimony about his own speed is not an indication of Karmann's speed. Trooper Griffeth's MapQuest testimony also does not establish Karmann's speed, as he did not testify that he verified the MapQuest route with the passengers. While the crash report contains some information as to the route Karmann took that evening, the MapQuest route was not entered on the record to allow this court to independently verify that it was the same as the route taken by Karmann. Without any ability to verify the route, it cannot be used to determine Karmann's speed. Also, Trooper Griffeth based his conclusion on a starting time from the Denison campus that was not verified. Further, although Catherine Maiorana stated to Trooper Griffeth that Karmann was traveling between 65 and 75 miles per hour on average, when he asked her directly "how fast was [Karmann] driving just prior to the accident" she responded "I don't know." Trial Tr., State's Exhibit C, p. 3. When asked again "What speed were you doing?" she answered "I don't know."

*Id.* at p. 4. Therefore, her statement cannot support the finding that Karmann was traveling between 65 and 70 miles per hour immediately before the crash, when she stated that she did not know what speed they were traveling at the moment of impact.

{¶61} There is no evidence in the record that Karmann was traveling within the range that the trial court determined was reasonable for the conditions. Therefore, Godfrey's conviction is not supported by sufficient evidence.

*Manifest Weight of the Evidence*

{¶62} Where a defendant is convicted in a trial by jury, an appellate court must be unanimous to reverse the decision based upon the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). However, "[w]here a trial is not to a jury, a majority of the Court of Appeals may reverse a judgment on the manifest weight of the evidence." *State v. Gilkerson*, 1 Ohio St.2d 103, 104 (1965); *State v. Hill*, 7th Dist. Mahoning No. 09-MA-202, 2011-Ohio-6217, ¶ 49. Assuming, arguendo that the evidence discussed above was sufficient to find that Karmann was traveling at a speed reasonable for the conditions, such a finding is against the manifest weight of the evidence.

{¶63} The trial court based its decision that Karmann was traveling at a reasonable rate of speed for the conditions on Loomis' statement, Maiorana's statement, and Trooper Griffeth's MapQuest testimony. None of this evidence

should be afforded substantial weight. The statements of Loomis and Maiorana were hearsay, as they were contained in the crash report. Neither testified at trial.

**{¶64}** Further, when Loomis was asked whether he saw the accident or just the bounce caused by the crash, he answered "Just the bounce." Trial Tr., State's Exhibit E ("Crash Report"), p. 29. When asked whether there were vehicles between his car and the accident, he replied "No, I don't think there were." *Id.* at p. 30. When asked "Did you see a vehicle ahead of you prior to observing the bounce?" he replied "No." *Id.* The only indication we have that Loomis was following Karmann was his statement that no one had passed him. He may have been following her for some time without noticing her, or she may have passed him immediately before the crash without him noticing. One must be true, as the accident occurred in front of him and he *never saw her car until it happened*. His inability to perceive a vehicle either passing him or driving in front of him limits the reliability of his testimony, as it relates to her speed.

**{¶65}** Further, even if the trial court inferred that Loomis was following Karmann's car from his statement that no one had passed him, nothing in his statement indicated whether she was pulling away, staying on pace with his speed, or going slower. Loomis neither stated what he thought her speed was, nor gave any indication as to how fast or slow she was moving in relation to his own vehicle. While he stated that *he* was traveling 66 miles per hour, we have no idea

how fast *Karmann* was going in relation to that speed. To reach the conclusion that Karmann's speed matched that of Loomis, the court must infer that Loomis had been behind Karmann for a period of time, and assume she had not recently passed him. To draw the conclusion that her speed matched his, the court must infer that because she was in front of Loomis for a period of time, she was going his same speed. This is an inference built upon an inference, and as such not evidence of Karmann's speed. *State v. Cowans*, 87 Ohio St.3d 68, 78 (1999).

{¶66} As to Maiorana's statement, she not only indicated that she did not know Karmann's speed at the time of impact, but that she was dozing off just prior to the accident. This explains why she did not see the semi until immediately before the crash and did not know the speed Karmann was traveling. While Maiorana speculated as to Karmann's average speed, the fact that she could not remember the actual speed at the point of the impact, coupled with her dozing off until right before the accident, renders her statement unreliable.

{¶67} As to Trooper Griffeth's MapQuest testimony, even if the accident occurred exactly where it should have according to the MapQuest route, and that route is in fact the route taken by Karmann that evening, it is only evidence of Karmann's average speed. Madison Sanders, another passenger in the vehicle, provided a statement that was included in the crash report, where she indicated that "Traffic was heavy stop and go at first but it did not last long." Crash Report,

-29-

p. 26.  Trooper Griffeth did not indicate how this was factored into his MapQuest calculations, even though it would have an impact on the average speed.

**{¶68}** Further, Trooper Griffeth testified that the start time for his calculations was based upon a phone call from Karmann to her father.  His crash report, however, states that the start time was based upon a "cell phone *text message* sent by [Karmann] to her *Mother* * * *."  (Emphasis added) Crash Report, p. 16.  There is no indication in the record as to how Trooper Griffeth determined that a text message occurred at the beginning of the journey.  Instead, the crash report contains the statement made by Sanders, who told Trooper Griffeth that Karmann "did *call her dad* as we drove leaving the campus." (Emphasis added).  *Id.* at p. 22.  She was the only passenger to state that Karmann used her phone at the start of the journey.  Therefore, the start time for the MapQuest calculation in the crash report is not consistent with the statement Sanders provided, and is further not consistent with Trooper Griffeth's testimony at trial.

**{¶69}** We cannot assume that Karmann's phone call to her father as stated by Sanders was the same as the text message to her mother that Trooper Griffeth used to determine the start time.  If both a call and a text message were sent from Karmann at different times, using the wrong communication could impact how long the car would have been on the road and change the average.  There is no

indication that this calculation was performed twice, once with a text message and once with a phone call, and Trooper Griffeth provided no testimony to clarify why he used a text message instead of a phone call for the start time in the crash report. Further, Sanders did not state *when* the phone call was made which could independently verify the start time. Instead, Trooper Griffeth must have relied on an outside piece of information to make this determination. Whatever Trooper Griffeth relied on is not in the record. Without this information or any testimony by Trooper Griffeth to clear up these inconsistencies, the trial court could not know whether Trooper Griffeth used the correct communication, and therefore cannot determine that he used the correct start time.

**{¶70}** Where Loomis's statement requires inference upon inference, accepting the MapQuest testimony as evidence of Karmann's speed requires assumption built on assumption. We must assume Trooper Griffeth used the right route, assume that he factored in the traffic, and assume that he used the right communication to the right person to obtain the right start time. Trooper Griffeth provided no testimony regarding any of these variables, and there is no other evidence in the record to allow this court to independently verify his methodology. As a result, the testimony regarding MapQuest is completely unreliable in even determining Karman's *average* speed. The trial court inferred that Karmann was

traveling her average speed at the time of the crash. Because the MapQuest

testimony cannot provide that average speed, it cannot support the inference.[3]

{¶71} As to the evidence that Karmann was traveling at an unreasonable

rate of speed:

> Godfrey presented substantial evidence that Karmann was traveling above the posted speed limit. In Defendant's Exhibit 2, the expert explained how the Event Data Recorder ("EDR") worked, stated that he had verified its accuracy and how that was done, stated that it was working at the time of the accident and that the readings were valid. The statement then goes on to state that the recorded traveling speed of 95 mph was valid for this accident. In Defendant's Exhibit 4, the expert stated that had the Karmann vehicle been traveling at a reasonable speed, the accident would not have occurred. Larry Neuenschwander, whose vehicle was struck by Karmann's vehicle after it struck the trailer, testified that he observed Karmann's vehicle crossing the median and coming at him at a fast rate. Tr. 25-29.
>
> Ohio State Trooper Gary Griffeth testified that based on the physical evidence at the scene, the speed stated by the black box was reliable. Tr. 92. He also testified that even without the numbers presented by the black box, the physical evidence indicated that Karmann was traveling well above the posted speed. Tr. 93. He concluded that Karmann's speed was a significant factor in the accident. Tr. 98.
>
> Godfrey presented the testimony of Sergeant Christopher Kinn ("Kinn") who is a trained accident reconstructionist. He testified that Karmann's speed was unreasonable. Tr. 151-52. He further testified that if Karmann's vehicle had been going within five or ten miles over the posted speed limit, the accident would not have occurred. Tr. 154. Finally Kinn testified that he not only regularly relies upon EDR's for information, but that the physical evidence at the scene,

---

[3] I find it curious that the trial court found that the EDR data was suspect because it was not independently verified, when it accepted the MapQuest route without having the route offered into evidence and without anything in the record that would verify its results.

such as the damage to the vehicles and the distance Karmann's vehicle traveled post-impact, supports the validity of the numbers provided by the EDR in this case. Tr. 170.

Finally, Godfrey presented the testimony of Frederick Greive ("Greive"), an accident reconstructionist. He testified that he had reviewed the EDR data, photographs of the vehicles, the police reports, the scene, and the vehicles themselves. Tr. 174-75. Based upon all the evidence he had before him, Grieve determined that the cause of the accident was the speed of Karmann's Chevrolet Tahoe. Tr. 176. Grieve also testified that all of the physical evidence supported the data from the EDR as to the speed of Karmann's vehicle. Tr. 179. He, like Kinn, based his conclusion on the amount of damage done to the vehicles and the distance that the Karmann vehicle traveled post-impact. Tr. 179.

*Godfrey I*, 2013-Ohio-3396, ¶ 7-10.

{¶72} As this court has previously found, there is evidence that Karmann was traveling at an unreasonable rate of speed independent of the EDR data. Further, the reliability of the EDR data was never in dispute at trial, as it was the State, through Sergeant Kinn, who downloaded it as part of his investigation. If EDR data was inherently unreliable, Sergeant Kinn would not have utilized it in his own determinations. Further, Trooper Griffeth testified that Karmann was traveling at 95 miles per hour, based upon Sergeant Kinn's investigation. Indeed, the crash report stated: "Preliminary results are well above the posted limit. Exact speed will be supplemented upon review by crash Re-Constructionists." Crash Report, p. 16. The reliance by the State's own investigators on the EDR data provides it substantial weight. Indeed, the State did not question the validity of the

-33-

EDR data at trial, and instead argued that Karmann's speed was irrelevant. As we indicated in *Godfrey I,* that is not an accurate statement of law.

**{¶73}** As the weight of the evidence indicates that Karmann was traveling at an unreasonable rate of speed for the conditions, and there is no reliable evidence to the contrary, I believe that the trial court clearly lost its way when it found beyond a reasonable doubt that Karmann had the right of way at the time of the accident.

**{¶74}** Accordingly, I would sustain Godfrey's second assignment of error.

/jlr